BEN HOWARD, JR. v. VILLAGE OF CHISHOLM.[1]

March 23, 1934.

No. 29,800.

[1]Reported in 253 N. W. 766.

246.

*Rosemeier & Montague,* for appellant.
*Frank M. Talus,* for respondent.

*HOLT, Justice.*

The appeal is from an order denying defendant's motion in the alternative for judgment notwithstanding the verdict or a new trial.

Defendant, a municipal corporation, maintains a community building wherein hockey and other games are played. It appears that admission is free to the players and to spectators. On the west side of the building, about six feet above the ice, was a balcony for the spectators, containing six tiers of seats. The front tier was protected by a railing about 30 inches high, made of one and one-half-inch gas pipe, one at the top and one half way down. These were fastened to upright pipes of the same diameter, about eight feet apart. These upright pipes had a foot or flange about six inches in diameter. Holes therein were drilled, through which lag screws passed into the floor plank. It appears that the spectators were in the habit of rushing to the railing and leaning over it when the game was played close thereto. Usually the village kept one of its watchmen on the balcony to warn the spectators back. Notwithstanding this, the evidence shows that as the railing repeatedly became loosened and insecure, attempts were made to plug the holes and again drive down the lag screws. On March 26, 1933, while plaintiff was playing hockey directly below this balcony, the spectators surged against the railing, and about 30 feet thereof gave way and fell, with some 20 persons, upon plaintiff below, injuring his left arm and left leg. No bones were broken, but the tendon connected with the quadriceps muscle and controlling the movements

of his left leg was sprained. A verdict for $3,500 was returned for plaintiff.

Under the law in this state the village could have defended successfully on the ground that it owned and maintained this building in its governmental capacity for the health and recreation of its inhabitants. Emmons v. City of Virginia, 152 Minn. 295, 188 N. W. 561, 29 A. L. R. 860. But evidently the village did not wish to avail itself of this defense; for plaintiff pleaded that it had procured insurance against injuries suffered by persons in the use of said building, and that the insurer, in its policy, had agreed not to defend on the ground that the village was in the exercise of a governmental function in furnishing the building for the use to which it was put. The general denial in the answer formally meets the issue of the alleged insurance, but the record shows that in the discussion with the court the counsel for the parties assumed to try the case on the theory that the village should be held liable if the evidence justified recovery against a private person owning and using the building as it was here used. On that theory the evidence was received and the issues submitted. Nowhere in the trial nor on this appeal has immunity been suggested on the ground that the building or its use was for governmental purposes. Regarding the village as a private person or association for the purposes of this lawsuit, the evidence plainly justified the jury in finding that plaintiff's injuries were caused by defendant's negligent construction and maintenance of the balcony railing. It knew that spectators frequently surged against it so as to loosen the lag screws, necessitating repeated repair. It had full knowledge that the railing was not strong enough for the strain to which it was subjected. Defendant cites only four cases which are claimed to point to nonliability, viz: Wells v. Minneapolis B. & A. Assn. 122 Minn. 327, 142 N. W. 706, 46 L.R.A.(N.S.) 606, Ann. Cas. 1914D, 922; Rayfield v. Sans Souci Park, 147 Ill. App. 493; Carey v. Kansas City, 187 Mo. 715, 86 S. W. 438, 70 L. R. A. 65; Guilmartin v. Philadelphia, 201 Pa. 518, 51 A. 312. Nothing was decided in the case first cited which is of assistance here. There the plaintiff, a spectator at a baseball game, was injured by a batted ball; and one of the issues

was her assumption of the risk in occupying an unprotected seat. In the Rayfield case the plaintiff, injured by the mirror she broke, was held to be the sole cause of the accident. In the Missouri case the defendant city had placed a wire fence around a reservoir in its park, but the plaintiff's decedent, an 11-year old boy, climbed the fence and was drowned. The court regarded him a trespasser and held that as to trespassers the fence afforded a reasonable warning and protection. In the last cited case the boy injured climbed a dilapidated iron gate in a block acquired by the defendant city for park purposes but which had not been set in order or opened to the public. On the facts there the city was held not liable. In none of these cases is there any similarity with the case at bar. On the other hand, respondent is sustained by Schofield v. Wood, 170 Mass. 415, 49 N. E. 636, and Stewart v. Cobalt C. & S. Assn. 19 Ont. L. Rep. 667. However, plaintiff stands in a better position than in the cases cited, for he cannot be charged with assumption of risk or contributory negligence on this record. The trial court did not err when refusing to direct a verdict or grant judgment notwithstanding.

The verdict of $3,500 is assailed as excessive. Plaintiff was a strong, healthy, and active boy about 17 years old. No bones were broken or injured. No tissues or muscles were cut or mangled. There were some surface contusions on the arm and leg which are now healed without scars. The swelling around the knee was inconsiderable. He stayed in bed one week, remained home another week, and then resumed his school work, using a crutch or crutches for a time. It is thought the large knee tendon at its attachment with the quadriceps muscles was sprained. Nothing wrong is visible. Of course there was considerable pain at first. That has almost entirely subsided. There has been atrophy, indicated by comparing the measurement of the two legs. But this atrophy disappeared to the extent of a quarter of an inch during the last month before the trial. The testimony of his attending physician does not warrant a finding of permanent injury. The most he can say as to the future is that a severe strain of that leg "might" produce a recurring sprain. Defendant's expert, a man of much longer practice

than the expert of plaintiff hereinafter mentioned, was of the opinion that within six weeks plaintiff would be completely restored, he being unable in two examinations, a month apart, to detect any indications of injury upon which to base a prediction of permanent disability. The one medical expert of plaintiff who gave the opinion that a 25 per cent permanent disability in the left leg would result made only one examination (June 1). From such examination and the testimony of the attending physician, he gave the opinion that plaintiff had a 100 per cent disability for two weeks, that he would have as complete recovery as he was going to get in ten months, after which he would expect him to get around in a normal manner, but he would be decidedly hampered in football and hockey games. Up to the time of the trial fatigue produced pain, but he thought that would not occur after the lapse of ten months.

We appreciate that the human body may be painfully disabled from injuries sustained by nerves or muscles so hidden and involved as to baffle the best medical experts not only as to cure but as to any reliable prognosis. This notwithstanding, juries often must come to a conclusion and fix the amount of damages. But when it comes to allowing for future pain and permanent disability, the evidence should disclose a reasonable probability that such will result. It is common knowledge that the recuperative forces differ very much in individuals, even of the same age and outward appearance. Sprains of ligaments, tendons, and muscles may take some time to heal to such an extent that a satisfactory prediction can be made as to the ultimate result. In this case barely ten weeks elapsed between the accident and the trial. We are impressed by the reading of the medical experts' testimony that it was too early to make any reliable prognosis of permanent disability or injury. And without permanent injury to the functions of the left leg, the verdict must be regarded as excessive. This is a case where the lapse of time would appear an essential element in ascertaining the extent of the injury. When such time has elapsed the medical experts may be able to give some definite opinion as to whether or not disability remains. Aside from the amount of the verdict, defendant's liability

was fairly and fully tried on a theory it acquiesced in. The amount of recovery is the only issue that should be retried.

The order denying judgment notwithstanding the verdict is affirmed; but a new trial is ordered solely on the amount of damages to be awarded plaintiff.