DENNIS WAYNE PAUL v. JAMES L. FARICY AND OTHERS.
ELMER L. PAUL v. SAME.
CITY OF ST. PAUL, APPELLANT.[1]

April 14, 1949.

Nos. 34,750, 34,751.

[1]Reported in 37 N. W. (2d) 427.

*Bruce J. Broady,* Corporation Counsel, and *Marshall F. Hurley,* Assistant Corporation Counsel, for appellant.

*Briggs, Gilbert, Morton, Kyle & Macartney,* for respondents Paul.

*John J. Sexton* and *Freeman & King,* for respondent A. O. Smith Corporation.

*Otis, Faricy & Burger,* for respondent James L. Faricy.

*George L. Siegel,* for respondent Edmen L. Green.

MATSON, JUSTICE.

In each of two separate actions—one by Dennis Wayne Paul, a minor, by Elmer L. Paul, his father, for damages for personal injuries to Dennis, and the other by the father for the recovery of expenses incurred by reason of the injuries to his son—brought against defendants and consolidated for trial, we have an appeal by defendant city of St. Paul from an order in each case denying its blended motion for judgment *non obstante* or a new trial and for an order setting aside the directed verdict in favor of defendant A. O. Smith Corporation and granting a new trial as to all defendants.

Defendants Edmen L. Green, owner of the car involved herein, and James L. Faricy, driver of the car, on and prior to the date of the accident, were employes of defendant A. O. Smith Corporation, hereinafter called the corporation, in its plant at the fairgrounds in St. Paul. Both were employed from 8 a. m. until 4:30 in the afternoon. Since the fall of 1945, by special agreement between Green and his employer, Green on his way to work picked up the corporation's mail at the main post office and with his car delivered it to the plant office. For this extra travel in the morning, he was given credit on his working time so that he was considered as having commenced work at 8 a. m., although he did not arrive at the plant until sometime between 8:30 and 9 a. m. In addition, he was allowed four cents a mile for eight miles of morning travel in picking up the mail. During the same time he agreed, without any special compensation or mileage allowance therefor, to post the corporation's daily outgoing mail at a postal station on his way home from work.

At first, when he lived on Grand avenue, he deposited the mail at a postal station near Snelling and University avenues, which was located on his direct route home and required no extra travel. Prior to the date of the accident, however, Green moved to rural Ramsey county, and thereafter he posted the mail at a station near Snelling and Minnehaha, although such station was not on a direct route to his home. He also allowed other fellow employes of the corporation to use his car several times daily in the performance of the employer's business, for which the corporation paid him the usual four cents per mile.

On March 21, 1946, the day of the accident, shortly after the completion of the day's work at 4:30 p. m., Green as usual placed the corporation's outgoing mail in his car. Then, instead of driving directly to any postal station to deposit the mail, Green, accompanied by two fellow employes, James Kenny and defendant James L. Faricy—with the latter driving—started for Minneapolis for the purpose of purchasing for their own individual use war surplus overcoats for sale at a private home located in that city on Cedar avenue somewhere between Fiftieth and Sixty-fourth streets. En route they stopped for a lunch. After each of them had purchased an overcoat, Kenny was driven to his home at Franklin and Nicollet. Green and Faricy, with the latter still driving, then started for St. Paul via Franklin avenue to University and thence east on University to the place of the accident in St. Paul just west of the intersection of University avenue and Vandalia street. At all times the corporation's outgoing mail remained in the car. It was Green's intention immediately before the accident to deliver the mail to the postal station near University and Snelling.

Just prior to the accident at about 7 p. m., as they were approaching the Vandalia intersection, Faricy was driving the car at a speed of about 20 miles per hour directly behind a truck in the traffic lane to the right of the eastbound streetcar tracks. Faricy turned the car to the left to swing into the traffic lane occupied by the streetcar tracks, and almost immediately upon so turning the car struck the inclined apron of the southwest safety island located

immediately to the west of the Vandalia intersection for the convenience and protection of pedestrians intending to board eastbound streetcars. The front of the safety island facing the oncoming traffic from the west consisted of a concrete apron about 15 feet long, which at its extreme westerly end was 10 inches high and which increased gradually to a height of 2 feet above the pavement at its easterly end. Adjoining the easterly end of the apron stood a concrete bumper block or pier, *which rested upon but was not anchored to the pavement.* This block, in which certain traffic lights were embedded, was 4 feet high, about 3½ feet wide, and 2 feet thick and weighed approximately 4,200 pounds. A platform for pedestrians 10 inches high and 56 feet long extended easterly from the east side of the concrete block. The bumper block, which, as described, was located between the safety island apron and the pedestrian platform, extended vertically 3 feet 2 inches above the pedestrian platform and 2 feet above the high end of the apron. Although there is some conflict in the evidence, the apparent purpose of this arrangement was to protect from injury or damage not only pedestrians standing on the safety island, but also the occupants of automobiles colliding with the safety island, in that the concrete apron by its sloping design would slow down a colliding automobile before its onward rush was stopped by the 4,200-pound bumper block.

At the time of the accident, plaintiff Dennis Wayne Paul, who was then 11 years old, stood on the safety island's pedestrian platform near the bumper block in anticipation of boarding a streetcar. When the car driven by Faricy hit the concrete apron, it continued forward and upward onto the apron until it struck the bumper block, which by force of the impact tipped over onto the platform where Dennis stood. Dennis's left leg was crushed and pinned between the block and the platform. Faricy said he did not see the safety island prior to the collision and that he did not apply the brakes. When the car actually hit the bumper block, it had been, by its drag over the concrete apron, slowed down to a speed of 3 to 5 miles per hour. When the car stopped it was still on the

concrete apron, but its front end from the front axle forward hung suspended over the safety-island platform.

Dennis suffered numerous abrasions, cuts, and bruises upon his body, and it was necessary to amputate his left leg' at a point about five inches below the knee joint. Dennis's growth and the wear on the artificial limb he now wears will require its replacement every few years.

Pursuant to M. S. A. 161.03, subd. 4, that portion of University avenue involved herein, inclusive of the area occupied by and surrounding the aforesaid safety island, was in 1934 designated a part of the state trunk highway system. In connection with the reconstruction and improvement of this section of University avenue as a trunk highway, the engineering department of the city of St. Paul prepared and proposed plans for the conversion thereof to a state highway, and these plans included the design for the building of the above safety island as well as for an identical safety island located to the east of the Vandalia intersection on the other side of University avenue. These plans were submitted to the state highway department, which officially adopted and incorporated them as a part of its general plans for the project. These general plans and specifications, before the work was commenced, were in turn submitted to and approved by the St. Paul city council as provided by § 161.03, subds. 3 and 4. The construction work—which was completed in 1936—was performed by a private contractor under a contract with the state highway department. The city of St. Paul neither performed nor paid for any part of the construction work.

Subsequently, pursuant to § 160.41, the state of Minnesota, acting by and through its commissioner of highways, entered into a yearly maintenance agreement with the city of St. Paul whereby the latter, for a consideration of $500 per mile, agreed, with respect to portions of state trunk highways located within its corporate limits—inclusive of the section of University avenue here involved—to maintain such portions so as "to keep the same smooth and in good repair for the passage of traffic and free from all obstructions and impediments to traffic" and to "Maintain traffic control devices

and signals * * *." The maintenance agreement specifically provided, however, that it should *"not be the obligation of the city * * * to do any work which shall consist of extraordinary maintenance, betterments, construction, or reconstruction"* (italics supplied), and that the city was not to undertake any such work except under a special supplemental agreement. No supplemental agreement is herein involved.

In each action the trial court directed a verdict for defendant A. O. Smith Corporation and submitted the cases to the jury as to the other defendants. Verdicts for plaintiffs against defendants city of St. Paul, James L. Faricy, and Edmen L. Green were returned in each case. The verdict in the minor's action was for $50,000 and in the parent's action for $4,200. Thereafter, in each case the trial court denied the city's blended motion for judgment *non obstante* or a new trial and a motion for an order setting aside the directed verdict in favor of defendant A. O. Smith Corporation and granting a new trial.

 Appellant, the city of St. Paul (hereinafter called the city), contends that by virtue of § 161.03, subd. 4, it is not liable for damages arising out of negligent construction or maintenance of the safety island where this accident took place. Section 161.03, subd. 3, provides that no portion of a trunk highway lying within the corporate limits of any borough, village, or city shall be *constructed, reconstructed, or improved* unless the plans and specifications therefor shall be approved by the governing body of the municipality before the work is commenced. Section 161.03, subd. 4, after first providing that the state commissioner of highways shall by his order designate the definite location of a trunk highway or any portion thereof and that such order shall be filed with the county auditor, reads:

*"* * * Such counties or subdivisions thereof shall thereupon be relieved from responsibilities and duties thereon, * * *."* (Italics supplied.)

In construing the above-quoted sentence, it is to be borne in mind that it is well settled in this state that the legislature has the power, unrestricted by any constitutional limitation, to limit the liability of municipalities for injuries resulting from the negligent manner in which its streets and highways are constructed or maintained. A right of action against a municipality is a matter of legislative favor and may be withheld, granted absolutely, or granted on condition. In Schigley v. City of Waseca, 106 Minn. 94, 97, 118 N. W. 259, 260, we said:

"* * * *Manifestly, by virtue of its plenary power over the highways and over all the agencies of government which it has created, it may properly determine whether such agencies shall or shall not be liable to individuals for damages resulting from the careless and negligent manner in which such delegated duties are performed.* An individual has no right of action against the state for its failure to construct and maintain the highways in proper condition, and as against the will of the state he has no greater right against an agency of the state to which it has delegated the performance of such duties. But the state may, if it chooses, authorize a right of action if the municipality neglects the proper performance of its duties; and, as we have seen, *an intention to authorize such an action is inferred when a chartered municipality is given full power of control over the streets and highways within its limits.* * * * When it has been held to exist by implication, it may be taken away by the legislature, without violating any constitutional right of the individual." (Italics supplied.)

■ In the absence of any statute relieving a municipal corporation from liability for injuries resulting from negligence in the construction and maintenance of its streets and highways, the rule governing liability may be summarized as follows:

*In the use of its highways, streets, and sidewalks, a municipal corporation as a general rule is not liable for injuries to persons or property resulting from its adoption of an improper plan of a highway, street, or sidewalk construction when the defects in the plan*

*are due to a mere error in the exercise of a bona fide judgment,*[2] *even though reasonable men might differ as to which plan should have been adopted*[3] (Conlon v. City of St. Paul, 70 Minn. 216, 72 N. W. 1073), *subject, however, to:* .

(a) *A liability for damages resulting from a defect in the original plan for which there is no reasonable necessity and which is so obviously and palpably dangerous that no reasonably prudent man would approve its adoption.*[4] It is submitted that liability—under the doctrine of Blyhl v. Village of Waterville, 57 Minn. 115, 58 N. W. 817, 47 A. S. R. 596, and decisions in conformity therewith—based upon a defect in the plan for which there is no reasonable necessity, rests on the theory that the absence of reasonable necessity, as well as the obviously and palpably dangerous nature of the defect, indicates a failure to exercise a bona fide judgment at all with respect thereto when the plan was adopted. See, Conlon v. City of St. Paul, 70 Minn. 216, 218, 72 N. W. 1073. The adoption of the plan must involve a true exercise of discretion. There is no true exercise of discretion if a plan is adopted which, under the circumstances then existing, no reasonably prudent men could approve without an

[2]This is the general rule in the United States. See, Annotation, 90 A. L. R. 1502; 6 McQuillin, Municipal Corporations (2 ed.) § 2804; 5 Blashfield, Cyc. of Auto. Law and Practice (Perm. ed.) § 3206.

[3]This principle is to be distinguished from the rule governing cases wherein the adoption of a plan and its execution necessarily cause an injury to private property equivalent to an appropriation of some enjoyment thereof to which the owner is entitled. See, McClure v. City of Red Wing, 28 Minn. 186, 194-195, 9 N. W. 767, 769-770; Maguire v. Village of Crosby, 178 Minn. 144, 226 N. W. 398; Foss v. City of Montevideo, 178 Minn. 430, 227 N. W. 357; Greenwood v. Evergreen Mines Co. 220 Minn. 296, 19 N. W. (2d) 726; City of Detroit v. Beckman, 34 Mich. 125, 22 Am. R. 507; Annotation, 2 A. L. R. (2d) 725; 51 Central L. J. 185-190.

[4]Cf. Blyhl v. Village of Waterville, 57 Minn. 115, 58 N. W. 817, 47 A. S. R. 596; Conlon v. City of St. Paul, 70 Minn. 216, 72 N. W. 1073; McDonald v. City of Duluth, 93 Minn. 206, 100 N. W. 1102; Klaseus v. Village of Kasota, 128 Minn. 47, 150 N. W. 221; Genereau v. City of Duluth, 131 Minn. 92, 154 N. W. 664; see, 26 Minn. L. Rev. 531-533; 7 McQuillin, Municipal Corporations (2 ed.) § 2955; Annotation, 90 A. L. R. 1519.

arbitrary disregard for the reasonable safety of the public. 25 Am. Jur., Highways, § 354.

(b) *A liability for damages resulting from a defect in the original plan where such defect is embodied in the construction work and is permitted to remain after the municipality, while still in control of its streets and sidewalks, has reasonable notice that it is a source of danger.* City of Circleville v. Sohn, 59 Ohio St. 285, 52 N. E. 788, 69 A. S. R. 777.

(c) *A liability for damages resulting from its negligence in the execution of the plan where the construction work is under the control and supervision of the city.* In the adoption of a plan for highway, street, or sidewalk construction, a municipality acts in a governmental or quasi-judicial capacity, and its decision is conclusive and not subject to review by a court or jury in a private action on the theory that the plan was not wisely or judiciously chosen. Conlon v. City of St. Paul, 70 Minn. 216, 72 N. W. 1073; Blackwelder v. City of Concord, 205 N. C. 792, 172 S. E. 392, 90 A. L. R. 1495. In the execution of the plan, however, a municipality acts ministerially and is bound to see that the work is done in a reasonably safe and skillful manner. See, McClure v. City of Red Wing, 28 Minn. 186, 9 N. W. 767; City of Chicago v. Seben, 165 Ill. 371, 46 N. E. 244, 56 A. S. R. 245; Nelson v. Kansas City, 170 Mo. App. 542, 157 S. W. 94; 5 Blashfield, Cyc. of Auto. Law and Practice (Perm. ed.) § 3206; 25 Am. Jur., Highways, § 354; 6 McQuillin, Municipal Corporations (2 ed.) §§ 2804, 2805; 51 Central L. J. 185-190; 26 Minn. L. Rev. 531; Annotation, 90 A. L. R. 1512.

(d) *A liability for damages resulting from negligence in the maintenance and repair of the highway, street, or sidewalk after the construction work has been completed if such highway, street, or sidewalk is then under the municipality's control.* It has long been the established rule in this state that a city is under legal obligation to exercise reasonable care to keep and maintain its streets in a safe condition for public use.[5] Conlon v. City of St. Paul, 70 Minn.

---

[5]This is an exception to the general rule that a municipality is not liable for torts committed in the exercise of its public or governmental powers.

216, 72 N. W. 1073; Annotation, 90 A. L. R. 1515, 1518; 4 Dunnell, Dig. & Supp. §§ 6814, 6818, and cases there cited; 26 Minn. L. Rev. 485.

Even with respect to streets taken over and designated as part of the state trunk highway system, the courts have generally, in the absence of any statutory provision to the contrary, held municipalities liable for injuries resulting from negligent construction or maintenance.[6]

■ In providing through § 161.03, subd. 4, that "Such counties or subdivisions thereof shall thereupon be relieved from responsibilities and duties thereon," to what extent did the legislature intend to modify the above rules of municipal liability for negligence in the construction and maintenance of streets which have been designated a part of the state trunk highway system? A statute should be construed, if possible, to give effect to all its provisions. § 645.16. As already noted, subd. 3 of § 161.03 specifically provides that no portion of a trunk highway lying within the corporate limits of any borough, village, or city shall be *constructed, reconstructed, or improved* unless the plans and specifications therefor shall be approved by the governing body of such municipality *before the work is commenced*. Clearly, the legislature intended thereby that the municipal corporation should take and assume an active responsibility in the final formulation and approval of a satisfactory plan pursuant to which the streets should be *constructed, reconstructed,*

The exception rests upon special considerations of public policy, or upon the doctrine of *stare decisis*. Schigley v. City of Waseca, 106 Minn. 94, 118 N. W. 259; 4 Dunnell, Dig. & Supp. § 6814; 26 Minn. L. Rev. 293.

[6]Pickett v. Carolina & N. W. Ry. 200 N. C. 750, 158 S. E. 398; Smith v. City of Algona, 232 Iowa 362, 5 N. W. (2d) 625, and cases cited; Longstreet v. County of Mecosta, 228 Mich. 542, 200 N. W. 248; Bell v. S. C. State Highway Dept. 204 S. C. 462, 30 S. E. (2d) 65; Atkinson v. Town of Decatur, 131 Miss. 707, 95 So. 689; Town of Senatobia v. Dean, 157 Miss. 207, 127 So. 773; City of Lumberton v. Schrader, 176 Miss. 272, 168 So. 77; Maynard v. Town of Westfield, 87 Vt. 532, 90 A. 504; 5 Blashfield, Cyc. of Auto. Law and Practice (Perm. ed.) § 3196. Contra, Glover v. Town of Ponchatoula (La. App.) 17 So. (2d) 44, and see 7 McQuillin, Municipal Corporations (2 ed.) § 2922, p. 78.

*or improved,* to the end that any plan adopted should effect a practical and satisfactory integration of trunk highway streets with other streets of the city from the standpoint of traffic regulation and safety. In the light of the statutory object to be attained (§ 645.16, subd. 4), there is nothing to indicate that the legislature, in thus providing so specifically for municipal approval as a condition precedent to the commencement of work, intended to relieve municipal corporations of their usual responsibilities and liabilities in exercising a sound discretion in the approval of street construction plans. If anything, the legislature went out of its way to insure that a city's usual obligations should continue. The provision in § 161.03, subd. 4, to the effect that counties or subdivisions "shall thereupon be relieved from responsibilities and duties thereon," pertains not to responsibilities for exercising a sound discretion in the adoption of a plan of construction, reconstruction, or improvement for streets, but to the responsibilities for the maintenance of such streets. This becomes clear by the proviso found in the same sentence of § 161.03, subd. 4, to the effect that if a change is made in the route so that a portion of a street is no longer included in the trunk highway system such portion shall revert to the governmental subdivision "originally charged with the care thereof." Obviously, the entire emphasis is upon the "care" or maintenance of the street in providing for a return of the street to its original control, because, in the first instance, the city was wholly relieved of control only with respect to "care" or maintenance.

Clearly, the city's liability, if any, for a defect in the plan which it approved was in no way affected or modified by the provisions of § 161.03, subd. 4. In approving the plan of street construction submitted by the state highway commissioner, the city actively participated in the plan's adoption and became liable for damages for injuries resulting from any defect in the plan to the same extent that it would have been had it, without any participation by the state, formulated and adopted such plan for one of its nontrunk highway streets. See, Maguire v. Village of Crosby, 178 Minn. 144, 226 N. W. 398. Work upon a street designated as part

of a trunk highway by order of the commissioner is subject to the control of the city as to the plan of construction. See, Maguire v. Village of Crosby, *supra;* Foss v. City of Montevideo, 178 Minn. 430, 227 N. W. 357; Greenwood v. Evergreen Mines Co. 220 Minn. 296, 19 N. W. (2d) 726. In the instant case, the issue is whether the plan approved by the city council was so improper as regards the safety island where this accident occurred as to render the city liable in damages for injuries resulting from defects therein. The evidence shows that the city council, in approving the plan of construction, relied upon the advice and drafting skill of the city engineer, a man of considerable experience and recognized ability. In fact, the plan was drafted under his supervision. Prior to preparation of the plan and specifications, he visited a number of the larger cities in the United States and examined the safety islands which they used. In the course of the drafting work, there were numerous conferences between the engineers of the city and of the state highway department. The city engineer testified that it was his opinion that the island was safe for pedestrians if driving was done in accordance with traffic regulations. An expert witness for plaintiff, an experienced and qualified engineer, testified, however, that in his opinion sound engineering practice was not followed in the design of the island as a safety measure for the protection of pedestrians. It was his opinion that the bumper block could have been anchored to either the pavement or to the concrete apron or to both by the use of steel dowels. There is much variation in the theories of highway engineers as to how a safety island should be built. These variations stem from a difference in opinion as to the purpose of a safety island with respect to the amount of protection to be given to pedestrians as opposed to the probable injury inflicted upon the occupants of automobiles by colliding with the island. Ordinarily, the fact that a city council, in approving a plan of street construction, relies upon the advice and drafting skill of a competent engineer, even though there is some conflict in the evidence as to whether the best plan was adopted, is of great weight

in establishing the exercise of a bona fide judgment.[7] The shield of expert advice does not, however, absolve a city from liability in damages for a defect in the original plan for which there is no reasonable necessity and which is so obviously and palpably dangerous that no reasonably prudent man would approve its adoption. (See, subd. [a] of the rule hereinbefore stated.) Here, an unanchored concrete block weighing over 2 tons, standing 4 feet high, was placed on end next to the safety island for pedestrians. Abutting this 2-ton bumper block on the westerly side was an inclined concrete apron 15 feet long with a height of 2 feet next to the block and a height of 10 inches at the lower end. The apron was designed to slow down oncoming automobiles, in case a car struck the apron, by causing the bottom of the car to skid upward toward the bumper block. Obviously, the apron was too short and too low to lift the rear or driving wheels of a car off the pavement so as to deprive them of traction before the bumper block was reached. No better device could have been designed to insure that an automobile would deliver its impact on the 2-ton bumper block above its center of gravity. No effort was made to anchor the block either to the pavement or to the apron to prevent it from being tipped over upon unsuspecting pedestrians standing on the safety island. Its only stability was its own dead weight, which was obviously insufficient to keep it on end when struck by a heavy automobile at a point more than halfway above its base. What could be a more palpable source of danger to pedestrians than an unanchored block weighing over 2 tons and equipped with a ramp to direct the force of colliding automobiles at a point above its center of gravity? As a safety measure, it violated the most elementary laws of physics and presented a danger that must have been apparent to any reasonably prudent man. Those who are charged with the responsibility of exercising a bona fide judgment in matters of structural design are entitled to place great reliance upon the advice of an expert, but

---

[7]See, Dodds v. West Liberty, 225 Iowa 506, 281 N. W. 476; Herman v. City of Buffalo, 214 N. Y. 316, 108 N. E. 451; Giaconi v. City of Astoria, 60 Or. 12, 113 P. 855, 118 P. 180, 37 L.R.A.(N.S.) 1150.

such expert advice may not be used as a shield to justify a failure to perceive a defect that is wholly unnecessary and which is not only apparent but is obviously and palpably so dangerous that no reasonably prudent man would approve its adoption. Here, the defect was clearly unnecessary, regardless of which theory or combination of theories was adopted for safety-island construction. Both pedestrians and automobile passengers could have been protected by a higher and longer ramp that would have lifted the vehicle's driving wheels free of the pavement surface. We also take judicial notice of the obvious fact that the bumper block could have been so anchored that it could not possibly have been tipped entirely over upon unsuspecting pedestrians.

The city had nothing to do with the execution of the plan—furthermore there is no evidence of any negligence in the work of construction—and therefore we have no occasion to apply subd. (c) of the rule above set forth.

■ There remains for consideration the question of whether the city became liable for injuries resulting from negligence in maintenance when, pursuant to § 160.41, it voluntarily entered into a maintenance contract with the state. (See, subds. [b] and [d] of the controlling rule.) Prior to entering into this maintenance agreement, the city had, as stated above, been relieved of all liability by virtue of § 161.03, subd. 4. It was fully relieved of liability, for the reason that, by § 160.06, all power and control of maintenance had been taken from the city and placed in the commissioner of highways. Maguire v. Village of Crosby, 178 Minn. 144, 226 N. W. 398. Where a city, pursuant to § 161.03, subd. 4, has been relieved of all responsibilities for the maintenance of a street designated as a portion of the state trunk highway system, and subsequently under § 160.41 it enters into a contract of maintenance with the state highway commissioner, the city, *as limited by the terms of the contract,* is thereby reinvested with the responsibility for maintenance as well as responsibility for any construction or reconstruction work it thereby agrees and is authorized to perform. It follows that the city's liability for negligence in maintenance must be

measured and limited by the terms of its maintenance contract. As already noted, the maintenance agreement specifically provided that it should "not be the obligation of the City * * * to do any work which shall consist of *extraordinary maintenance, betterments, construction, or reconstruction.*" (Italics supplied.) In the light of this limitation, it was erroneous to admit evidence of prior accidents to show that the city permitted a defect in the original plan and construction to remain after it had reasonable notice that it was a source of danger. (See, subd. [b] of the controlling rule.) At no time after the adoption of the plan and the completion of the construction work did the city have such power and control over the street—pursuant to the maintenance agreement or otherwise—as to impose upon the city any obligation, or to give it any right, to reconstruct the apron or to anchor or buttress the concrete bumper block. Such reconstruction, anchoring, or buttressing would have involved a change in design and construction of the island and would, to say the least, have constituted work of *extraordinary maintenance,* if not of *betterments* or actual *reconstruction.* The duty, power, and right of doing work equivalent to extraordinary maintenance, betterments, or actual reconstruction was not conferred by the state upon the city under the maintenance agreement, but was specifically withheld. Under its contractual obligation of maintenance, the city is not liable here for a failure to remodel or change the design or construction of the island. No liability could arise under subd. (d) of the rule, in that the city's limited maintenance work, regardless of how performed, had nothing to do with the occurrence of the accident.

■ The trial court did not err in directing a verdict for the A. O. Smith Corporation. Defendant Green, accompanied by his two fellow employes, at the completion of the day's work at 4:30 p. m., drove from their place of employment in St. Paul to a point somewhere beyond Fiftieth street on Cedar avenue in Minneapolis for the sole purpose of buying overcoats for their personal use. No inference of authority from the employer may be derived from Green's possession of the car. The car belonged to Green personally

and was under his sole control and not that of the employer. Although the corporation's outgoing mail was in the car—which according to prior custom and arrangement was to have been deposited at a postal station by Green while en route to his home from work—the trip to buy overcoats had nothing to do with the posting of the mail and was wholly independent thereof. Without, the slightest doubt, the overcoat-buying expedition would have taken place even if there had been no mail to post on that day. Before reaching the overcoat emporium, they stopped for lunch. On the return trip Kenny was taken to his home in Minneapolis. The sole cause of the trip was to buy overcoats, and in no sense was the delivery of the mail to a postal station a concurrent cause. The trip covered a route which, from the standpoint of direction and distance, had no connection with any route that could have been reasonably used in going either to a post office or to Green's home. The journey was not a slight deviation by a servant for his own purposes when on business for his employer. Obviously, the task of posting the mail while en route home did not vest Green with a roving commission characteristic of a salesman (Lausche v. Denison-Harding Chevrolet Co. 185 Minn. 635, 243 N. W. 52) in search of customers. Although Green intended on his return trip to post the mail near University and Snelling, his presence at the scene of the accident was the result solely of a personal errand. When the accident occurred, he had not returned to his usual course of travel in going from his employment to his home or to the postal station. There is no evidence upon which any jury could reasonably find that Green was acting within the scope of his employment when the accident occurred. An employe who, using his own automobile as transportation in going from his place of employment to his home, enters into an agreement with his employer to deposit the employer's outgoing mail at a postal station on his way home, is not acting within the scope of his employment so as to impose a tort liability for negligence upon his employer when, in leaving the employer's plant with the mail, he proceeds on an independent errand which takes him 100 or more blocks off his regular route in a direction which could

not reasonably be taken in going either to his home or to a postal station. See, Malmquist v. Hellenic Community of Minneapolis, Inc. 163 Minn. 10, 203 N. W. 420.

The trial court erred in admitting evidence of prior accidents and also erred in instructing the jury that it might consider whether the accident was caused by any negligence of the city in the maintenance of the safety island. By reason of these errors, a new trial is granted to defendant city in accordance with this opinion. The order of the trial court is affirmed as to defendant A. O. Smith Corporation. Because of the necessity for a new trial, other assignments of error need not be considered.

Affirmed as to defendant A. O. Smith Corporation; reversed and new trial granted as to defendant city of St. Paul.

PETERSON, JUSTICE (concurring in result).

I concur in the result.

