No. 13808

IN THE SUPREME COURT OF THE STATE OF MONTANA

1978

---

WILLIAM C. MODRELL,

Plaintiff and Appellant,

-vs-

THE STATE OF MONTANA,

Defendant and Respondent.

---

Appeal from: District Court of the First Judicial District,
Honorable Gordon R. Bennett, Judge presiding.

For Appellant:

Robert T. Cummins argued, Helena, Montana
Jackson and Kelly, Helena, Montana
Gregory Jackson argued, Helena, Montana
Sam Levinson, Seattle, Washington

For Respondent:

Keller, Reynolds and Drake, Helena, Montana
Keith Keller argued, Helena, Montana

---

Submitted: October 10, 1978

Decided: DEC 4 1978

Filed:

Thomas J. Kearney
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

Plaintiff appeals from a jury verdict and judgment for defendant (the State of Montana) in a personal injury action tried in Lewis and Clark County District Court. The salient facts follow.

Plaintiff is a resident of Seattle, Washington. In October, 1973, he came to Montana to hunt with a friend, McCandless, who lived in Big Fork, Montana. The two men, accompanied by McCandless' 11 year old son, traveled in McCandless' pickup from Kalispell to eastern Montana where they hunted deer and antelope. On October 23, 1973, plaintiff and his companions left an area near Broadus, Montana, to drive to the Radersburg area to hunt elk. McCandless was driving and his son and plaintiff were passengers in the pickup cab. The visability was clear, the road dry, and no other vehicles were in sight. Approximately three miles west of Broadus, on a straight, slightly graded uphill stretch of Highway 212, the vehicle moved to the right, its right wheels dropping about nine inches onto the inslope (the outside edge of the pavement). In returning to the pavement, the vehicle went out of control, skidding diagonally across both lanes and rolling over onto its top in the ditch.

Shortly thereafter, a highway patrolman arrived at the scene. At trial he testified that during the ensuing investigation, McCandless informed him that he was watching some antelope when the pickup left the pavement. The officer reported the cause of the accident as "driver negligence".

During trial, various expert testimony was taken revealing a diversity of opinion regarding the reasonable

safety of the road's design and maintenance. Numerous exhibits were received into evidence showing different standards for the construction and safety of roadside shoulders and inslopes.

Plaintiff raises two issues for our review:

1. Whether the District Court erred in admitting testimony by the State in support of the defense of financial feasibility?

2. Whether the evidence of the State's negligence clearly preponderates against the verdict and judgment in its favor?

Plaintiff contends the State's "sole and exclusive" defense was that of financial feasibility which, under State ex rel. Byorth v. District Court (1977), _____ Mont. _____, 572 P.2d 201, 34 St.Rep. 1447, the District Court erred in admitting.

In Byorth, this Court acting under its supervisory authority upheld the District Court's denial of State's motion for leave to amend its answer with (among others) the defense of nonresponsibility "due to lack of funds to construct and maintain safety features at the site of the accident." Byorth, 572 P.2d at 202. In so holding we stated:

> "As noted, the Tort Claims Act attaches liability
> to the State in the same manner and to the same
> extent that liability attaches to a private person.
> Section 82-4302(7). There is no common or statut-
> ory law which permits the driver of a brakeless
> car to plead he could not afford brakes because
> he had decided it was more important to pay his
> grocery bill. When he drives, the motorist assumes
> the duty of driving a safe car. If he fails
> to discharge that duty and that failure results
> in injury he is liable, regardless of his
> personal financial priorities. So, too, with
> the State. Whenever and wherever it chooses
> to build highways it assumes the duty of building
> and maintaining them safely and is answerable

if it fails to do so. This does not, as argued
by relator, make the State an insurer any more
than it makes a private party an insurer. The
negligence of the State must still be proven.
It simply withholds from the State a defense
a private party never had." Byorth, 572 P.2d
at 203.

We can, however, carry this analogy only so far. The State's duty to maintain and design safe highways is different than the duty of a driver to drive a safe car. Clearly, evidence of a driver's decision to pay for groceries before brakes is irrelevant on the issue of an allegedly breached duty of care. It has no legal bearing on the course of conduct taken. But the duty of the State to construct and maintain roadways in a reasonably safe condition stands on a different footing. Factors entering into the decision to elect one alternative over another are relevant to the extent that they bear as evidence on the reasonableness of the decision. The alternative selected must be realistic, viable and subject to state-of-the-art limitations. Obviously, cost must be a factor.

To be sure, reliance on cost as the sole and determining factor would be tantamount to assertion of a financial feasibility defense and therefore impermissible. However, where cost is but one among many factors affecting the State's choice of a particular method of construction or maintenance, it is relevant evidence on the reasonableness of the alternative taken.

Plaintiff here contends that "since it [financial feasibility] was not a proper defense, it was not a proper subject of testimony." We do not agree with this statement. Certainly the State was entitled to introduce evidence relevant to the reasonableness of its conduct in choosing to design, maintain, and repair the stretch of Highway 212

-4-

as it did. We have reviewed the instances cited wherein cost testimony was admitted and find none effectively amounts to assertion of a financial feasibility defense.

Moreover, the jury was effectively instructed that financial feasibility was not a defense. Instruction No. 8 read:

> "If you find the defendant negligent in planning or constructing or maintaining the highway in question, you may not excuse such negligence on the ground that proper construction was beyond the financial means of the State. Cost is not a factor in the duty of the State to plan, construct and maintain its highways in a reasonably safe condition."

The instruction properly follows the sequence of determinations contemplated by the law of negligence. A finding of negligence or that a duty of care was breached with respect to plaintiff necessarily precedes the assertion of an affirmative defense by the State. Without negligence legal accountability cannot follow. The instruction was, accordingly, predicated upon a finding of negligence.

The Byorth decision precludes the State from relying on financial inability as a defense to a negligence action, but it does not forbid the State from ever mentioning costs as a factor bearing on the reasonabless of its conduct. Here, despite repeated attempts, the defense was not received by the court. No such defense appears in the pleadings. At trial, the State was presumably showing that it was not negligent in its design and maintenance of Highway 212 and therefore presented evidence regarding the factors entering into the decision to resurface the road in a particular manner, i.e., with pavement overlays. Obviously, one such factor was cost.

Plaintiff next contends the evidence clearly preponderates against a verdict for the State. Reciting certain expert testimony and exhibits produced at trial, plaintiff reiterates to this Court that the State failed to meet reasonable standards of safety and knew it. The State, on the other hand, points out that the expert testimony was in conflict as to the appropriate standards and the State's compliance therewith. It also contends the jury could have found the State negligent but that its negligence was not the proximate cause of plaintiff's injury.

We do not indulge in conjecture either way. Plaintiff has the burden of proving his case at trial by a preponderance of the evidence. Our function in reviewing the jury's verdict is to determine whether there was no substantial credible evidence to support the verdict and judgment when viewed in a light most favorable to the prevailing party. We do not retry factual issues. Since the expert testimony and documentary evidence in this case expressed a diversity and conflict of opinion concerning the appropriate standards of conduct applicable to the State, it cannot be said the evidence supporting the verdict was "so inherently impossible or improbable as not to be entitled to belief." Berdine v. Sanders County (1974), 164 Mont. 206, 209, 520 P.2d 650, 651, (quoting Wallace v. Wallace (1929), 85 Mont. 492, 502, 279 P. 374, 377). By the same token, the jury is entitled to conclude what they will as to the proximate cause of plaintiff's injury so long as substantial evidence exists to support their conclusion. Plaintiff here asks us to view certain evidence favorable to him and decide both whether the State breached a duty of care to him and whether

such was the proximate cause of his injury.  That is the function of the jury.

The verdict and judgment of the District Court is affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____
Justices

Mr. Justice John C. Sheehy dissents:

I am unable to agree with the result in this appeal.

An additional statement of facts is necessary to understand the issues facing the Court here.

On the date of the accident, plaintiff was riding as a passenger in a Chevrolet pickup truck driven by his friend McCandless, as noted in the majority opinion. The vehicle was approximately three miles west of Broadus, Montana, on Highway No. 212 when the accident occurred.

From the evidence in the case, it appears that this particular stretch of highway was first constructed by the highway department in 1960. In that construction, a black-top pavement twenty-four feet wide was provided, with inslopes (the portion of the shoulders "in" or nearest to the paved highway) scaled at 5:1 (that is a one-foot vertical drop for each five feet of distance away from the edge of the pavement). According to the standards of the American Society of State Highway Officials (ASSHO) construction of inslopes on that scale is in accordance with good engineering practice.

In 1969, this highway was reconstructed because of its deteriorating condition and because of the need of a broader paved surface for highway travel. To accomplish this, the highway department determined that it would overlay on the 1960 blacktop an additional oil mat, but the width would be extended from twenty-four feet to twenty-eight feet. After the 1969 construction, the oil mat was striped with paint to provide a centerline, a twelve-foot driving lane in each direction, and a two-foot wide portion of the oil mat outside the striped driving lane to where the gravelled shoulder met the edge of the oil mat.

-8-

After the overlayment, the inslope was scaled at 3:1, and in places there was a sharp dropoff from the edge of the oil mat to the shoulder. The division engineer of the department recognized that the shoulder slope was dangerous, reporting by letter that the slope was so great that it was too risky to use the roller in connection with its construction and that the steep slope was quite hazardous and possibly should be delineated before the project was completed. Because of this condition, the department issued an extra work order on force account to flatten the inslope along the overlayment, to provide additional shoulder stability, and a less hazardous inslope for the travelling public. However, the steep condition was not thereby cured.

The final acceptance report in the department files dated February 6, 1970, indicated that the pavement inslope did not blend with the existing inslopes on the prior road and that there was a hazardous dropoff along the edge of the pavement. Thus, the department had notice of the situation from and since 1970.

The evidence also showed that on July 7, 1967, before the overlayment, the department had received an instructional memorandum from ASSHO in which design practices for roadside features and appurtenances were set out. Where the designed speed was fifty miles per hour or more, with respect to completed construction contracts, or those undergoing construction, it was recommended that roadside slopes should be at the scale of 6:1 or flatter, but if fills twenty-five to fifty feet existed, a maximum slope of 4:1 should be the objective.

In this case, the inslopes were scaled at the rate of 3:1 on the highway where there was a sixteen-foot fill.

The federal authorities, since federal monies were being used in connection with the cost of the construction overlayment, recognized the hazard. Correspondence in the department files indicates the department intended to ask for a waiver because of the steepness of the inslopes after the overlayment but this was never done.

The ASSHO recommendations also provided that in those cases where it was impossible to have inslopes flatter than 4:1 or 6:1 depending upon the height of the fill, that there should be warning signs or guardrails to protect the travelling public where such steeper slopes existed. None were provided here.

An expert called by the plaintiff testified the inslope as constructed after the overlayment failed to meet the standards of good engineering practice "because it doesn't provide a side slope that will enable a vehicle that for some reason inherently or otherwise may have gone beyond the edge of the shoulder to recover. The slope is so steep . . ." [Emphasis added.]

There is no dispute in the evidence that there was a dropoff from the right edge of the highway pavement to the shoulder. The highway patrolman reported nine inches. The experts measured from ten to thirteen and one-half inches of dropoff that extended along for the more than two hundred feet that plaintiffs vehicle travelled with its right wheels off the pavement surface, before it returned to the pavement surface, crossed the roadway and overturned. Plaintiff's expert explained how the accident happened:

> "Based upon the patrolman's report and
> his narrative to a large extent, the
> vehicle, the man, drove off the edge
> of the highway and he came to this steep
> inslope and consequently it would pull
> the car naturally downhill toward the
> shoulder, off to the right, and the

> normal procedure is to try to get
> back on the roadway. The very prudent
> thing to do is not to dynamite your brakes
> and try to climb back. You have to get
> a greater and greater--a term referred
> to as a 'track angle' of the tires--so
> you can climb over that inslope, the
> grade. Then, as this inslope became
> less at some point, the tires caught
> and suddenly the car took across the
> road in the direction where the tires
> were pointing, having a tendency to
> turn even more that way . . ."

This testimony was never refuted by any witness for the defendant.

The State did contend that the overlayment and inslopes have been constructed in accordance with good engineering practice, but this was founded upon the premise of employee Becker, who testified that there were no safety standards or guidelines for the construction of an overlay project. (Imagine!) However, the State was allowed to introduce a considerable amount of testimony covering four transcript volumes relating to procedures, costs and other problems faced by the highway department in connection with any highway construction or reconstruction project. To this latter evidence, plaintiff objected.

The appeal comes before us then as a situation in which plaintiff concedes the negligence of plaintiff's driver of the pickup truck in veering off the edge of the pavement but maintaining that the concurring negligence of the department in its construction of the highway was also a proximate cause of the plaintiff's injuries. Of course, the negligence, if any, of the driver of the vehicle, may not be imputed to the plaintiff passenger. In my opinion, plaintiff proved his case of concurring proximate negligence as a matter of law and judgment should have been entered for him after a determination of his damages proximately caused.

-11-

Although the State is not an insurer of one who uses the highways, State ex rel. Byorth v. District Court (1977), ____ Mont. ____, 572 P.2d 201, 34 St.Rep. 1447, it is under a duty to keep its highways in a reasonably safe condition for the ordinary use thereof.

This duty extends to the shoulder immediately adjacent to the paved portion of the highway, as it is common experience that vehicles may stray or veer from the usual or travelled portion thereof, by being forced off the paved portion, or straying off inadvertently. 39 Am.Jur.2d Highways, Streets, and Bridges §488.

It is the further duty of the State to construct its highways so that no latent or hidden defect or trap thereon constitutes an unreasonable danger to persons in vehicles, including those portions of the highway where it may reasonably be foreseen that vehicles might traverse though off the paved portion of the highway. 39 Am.Jur.2d Highways, Streets, and Bridges §489.

These duties apply whether the defect occurs in the original construction, or later through repair, reconstruction, resurfacing or maintenance. Beeman v. State of New York (N.Y. A.D. 1968), 289 N.Y.S.2d 263 (negligent maintenance); Clohessy v. State of New York (N.Y.Ct.Cl. 1958), 173 N.Y.S.2d 835; Paul v. Faricy (1949), 228 Minn. 264, 37 N.W.2d 427.

When defects are present the State's duty to cure or remove the same, or give warning thereof, begins when it has notice of the same and opportunity to act. Cameron v. State of California (1972), 7 Cal.3d 318, 497 P.2d 777; Parfait v. State Department of Highways (La. 1976), 334 So.2d 549.

The primary issue in this case which could give rise to liability was whether the State had caused to be constructed a defective or dangerous shoulder. Within that issue was a

subissue, whether the shoulder constituted an unreasonable hazard to vehicles foreseeably crossing the same at usual highway speeds.

To that issue and subissue, it was not relevant (1) that studies had been made before overlaying the original oil pad; (2) that cost was any consideration in deciding to overlay the old road; or (3) that the highway department, under a five-year plan, preplans the order and necessity of projects over a broad range of possibilities.

It is not a defense where the State is charged with constructing a hidden trap or defect in the highway, that the State carefully constructed the defect. The only issue in that instance subject to proof was whether in fact the defect existed. If such defect did exist, no matter what care the State exercised beforehand in considering choices of what kind of highway to construct or reconstruct, the end result is the same--an unreasonable risk to the travelling public, a breach of the State's duty toward the travelling public. Therefore, it was improper to admit evidence on behalf of the State tending to show that the terrain was difficult; or that the cost of cure was great; or the amount of available right of way was insufficient; or the cost of maintenance of the old road mandated the change; or funding by districts as required by statute limited the ability of the State to cure the defect; or a five-year plan was applicable to determine the wisdom of rebuilding the highway, or any other number of preconstruction items that had nothing to do with the central issue of whether or not a defect or trap did exist. That issue should have been determined by the jury from evidence answering "yes, it did exist" or "no, it did not exist" and by the further determination as to whether the defect was the proximate cause of plaintiff's injuries.

-13-

The record in this case is burdened with page after page of testimony relating to the extraneous matters noted foregoing. The jury got sidetracked so that the issue became not whether a hazardous condition existed but whether the State of Montana had a highway engineering department that used good engineering practice. As I stated, if the defect existed, it is not a defense that the defect was brought about by good engineering practice.

I am also of the opinion that there is an irreconcilable conflict between the holding in the majority opinion and our holding in the Byorth case. In Byorth, this Court stated if the State failed to discharge its duty to construct reasonably safe highways, and that failure resulted in injury, the State was liable "regardless of [its] personal financial priorities." 572 P.2d at 203. Yet here we are stating that financial priorities are a "factor" in determining negligence. Thus we now accord the State what was condemned in Byorth, "a defense a private party never had". 572 P.2d at 203.

> In Byorth, this Court went on to say:
>
> "Over and above the substantive consideration, the procedural complexities of the offered defense militate strongly against it. It would call forth in every highway injury or death case a jury review and decision on the State's entire highway program, including an infinitude of legislative as well as administrative decisions. The defense would need only to be pleaded to bar all but the very largest of claims, and even with those claims the evidentiary burden would become unmanageable." 572 P.2d at 203, 204.

That is exactly what happened in the Modrell case. On trial was not the simple issue of negligence in building or not building a defect in the highway, but rather the whole of the department's procedures in constructing and reconstructing highways. It may be coincidental, but the district judge who authored the above language in Byorth is the same

-14-

district judge who sat on the Modrell case in the District Court.  Byorth was handed down after this Modrell case had been tried in the District Court.  When he authored Byorth, the good judge was speaking from a searing experience.

I would reverse and remand with instructions to find for the plaintiff on the issue of liability and to determine damages.

_____
                Justice