MR. JUSTICE SHEEHY
dissents:
I am unable to agree with the result in this appeal.
An additional statement of facts is necessary to understand the issues facing the Court here.
On the date of the accident, plaintiff was riding as a passenger in a Chevrolet pickup truck driven by his friend McCandless, as noted in the majority opinion. The vehicle was approximately three miles west of Broadus, Montana, on Highway No. 212 when the accident occurred.
From the evidence in the case, it appears that this particular stretch of highway was first constructed by the highway department in 1960. In that construction, a blacktop pavement twenty-four feet wide was provided, with inslopes (the portion of the shoulders “in” or nearest to the paved highway) scaled at 5:1 (that is a one-foot vertical drop for each five feet of distance away from the edge of the pavement). According to the standards of the American Society of State Highway Officials (ASSHO) construction of in-slopes on that scale is in accordance with good engineering practice.
In 1969, this highway was reconstructed because of its deteriorating condition and because of the need of a broader paved surface for highway travel. To accomplish this, the highway depart *504 ment determined that it would overlay on the 1960 blacktop an additional oil mat, but the width would be extended from twenty-four feet to twenty-eight feet. After the 1969 construction, the oil mat was striped with paint to provide a centerline, a twelve-foot driving lane in each direction, and a two-foot wide portion of the oil mat outside the striped driving lane to where the gravelled shoulder met the edge of the oil mat.
After the overlayment, the inslope was scaled at 3:1, and in places there was a sharp dropoff from the edge of the oil mat to the shoulder. The division engineer of the department recognized that the shoulder slope was dangerous, reporting by letter that the slope was so great that it was too risky to use the roller in connection with its construction and that the steep slope was quite hazardous and possibly should be delineated before the project was completed. Because of this condition, the department issued an extra work order on force account to flatten the inslope along the overlayment, to provide additional shoulder stability, and a less hazardous inslope for the travelling public. However, the steep condition was not thereby cured.
The final acceptance report in the department files dated February 6, 1970, indicated that the pavement inslope did not blend with the existing inslopes on the prior road and that there was a hazardous dropoff along the edge of the pavement. Thus, the department had notice of the situation from and since 1970.
The evidence also showed that on July 7, 1967, before the overlayment, the department had received an instructional memorandum from ASSHO in which design practices for roadside features and appurtenances were set out. Where the designed speed was fifty miles per hour or more, with respect to completed construction contracts, or those undergoing construction, it was recommended that roadside slopes should be at the scale of 6:1 or flatter, but if fills twenty-five to fifty feet existed, a maximum slope of 4:1 should be the objective.
In this case, the inslopes were scaled at the rate of 3:1 on the highway where there was a sixteen-foot fill.
*505 The federal authorities, since federal monies were being used in connection with the cost of the construction overlaying, recognized the hazard. Correspondence in the department files indicates the department intended to ask for a waiver because of the steepness of the inslopes after the overlayment but this was never dpne.
The ASSHO recommedations also provided that in those cases where it was impossible to have inslopes flatter than 4:1 of the fill, that there should be warning signs or guardrails to protect the travelling public where such steeper slopes existed. None were provided here.
An expert called by the plaintiff testified the inslope as constructed after the overlayment failed to meet the standards of good engineering practice “because it doesn’t provide a side slope that will enable a vehicle that for some reason inherently or otherwise may have gone beyond the edge of the shoulder to recover. The slope is so steep . . .” [Emphasis added.]
There is no dispute in the evidence that there was a dropoff from the right edge of the highway pavement to the shoulder. The highway patrolman reported nine inches. The experts measured from ten to thirteen and one-half inches dropoff that extended along for the more than two hundred feet that plaintiffs vehicle travelled with its right wheels off the pavement surface, before it returned to the pavement surface, crossed the roadway and overturned. Plaintiff’s expert explained how the accident happened:
“Based upon, the patrolman’s report and his narrative to a large extent, the vehicle, the man, drove off the edge of the highway and he came to this steep inslope and consequently it would pull the car naturally downhill toward the shoulder, off to the right, and the normal procedure is to try to get back on the roadway. The very prudent thing to do is not to dynamite your brakes and try to climb back. You have to get a greater and greater — a term referred to as a ‘track angle’ of the tires — so you can climb over that inslope, the grade. Then, as this inslope became less at some point, the tires caught and suddenly the car took across the road in the direction where the tire's were pointing, having a tendency to turn even more that way . . .”
*506 This testimony was never refuted by any witness for the defendant.
The State did contend that the overlayment and inslopes have been constructed in accordance with good engineering practice, but this was founded upon the premise of employee Becker, who testified that there were no safety standards or guidelines for the construction of an overlay project. (Imagine!) However, the State was allowed to introduce a considerable amount of testimony covering four transcript volumes relating to procedures, costs and other problems faced by the highway department in connection with any highway construction or reconstruction project. To this latter evidence, plaintiff objected. The appeal comes before us then as a situation in which plaintiff concedes the negligence of plaintiff’s driver of the pickup truck in veering off the edge of the pavement but maintaining that the concurring negligence of the department in its construction of the highway was also a proximate cause of the plaintiff’s injuries. Of course, the negligence, if any, of the driver of the vehicle, may not be imputed to the plaintiff passenger. In my opinion, plaintiff proved his case of concurring proximate negligence as a matter of law and judgment should have been entered for him after a determination of his damages proximately caused.
Although the State is not an insurer of one who uses the highways, State ex rel. Byorth v. District Court (1977), 175 Mont. 63, 572 P.2d 201, it is under a duty to keep its highways in a reasonably safe condition for the ordinary use thereof. This duty extends to the shoulder immediately adjacently to the paved portion of the highway, as it is common experience that vehicles may stray or veer from the usual or travelled portion thereof, by being forced off the paved portion, or straying off inadvertently. 39 Am.Jur.2d Highways, Streets, and Bridges § 488.
It is the further duty of the State to construct its highways so that no latent or hidden defect or trap thereon constitutes an unreasonable danger to persons in vehicles, including those portions of the highway where it may reasonably be forseen that vehicles might *507 traverse though off the paved portion of the highway. 39 Am.Jur. 2d Highways, Streets, and Bridges § 489.
These duties apply whether the defect occurs in the original construction, or later through repair, reconstruction, resurfacing or maintenance. Beeman v. State of New York (1968), 29 A.D.2d 1040, 289 N.Y.S.2d 263 (negligent maintenance); Clohessy v. State of New York (1958), 11 Misc.2d 952, 172 N.Y.S.2d 835; Paul v. Faricy (1949), 228 Minn. 264, 37 N.W.2d 427.
When defects are present the State’s duty to cure or remove the same, or give warning thereof, begins when it has notice of the same and opportunity to act. Cameron v. State of California (1972), 7 Cal.3d 318, 497 777; Parfait v. State Department of Highways (La.1976), 334 So.2d 549.
The primary issue in this case which could give rise to liability was whether the State had caused to be constructed a defective or dangerous shoulder. Within that issue was a subissue, whether the shoulder constituted an unreasonable hazard to vehicles forseeably crossing the same at usual highway speeds.
To that issue and subissue, it was not relevant (1) that studies had been made before overlaying the original oil pad; (2) that cost was any consideration in deciding to overlay the old road; or (3) that the highway department, under a five-year plan, preplans the order and necessity of projects over a broad range of possibilities.
It is not a defense where the State is charged with constructing a hidden trap or defect in the highway, that the State carefully constructed the defect. The only issue in that instance subject to proof was whether in fact the defect existed. If such defect did exist, no matter what care the State exercised beforehand in considering choices of what kind of highway to construct or reconstruct, the end result is the same — an unreasonable risk to the travelling public, a breach of the State’s duty toward the travelling public. Therefore, it was improper to admit evidence on behalf of the State tending to show that the terrain was difficult; or that the cost of cure was great; or the amount of available right of way was insufficient; or the cost of maintenance of the old road mandated the change; or *508 funding by districts as required by statute limited the ability of the State to cure the defect; or a five-year plan was applicable to determine the wisdom of rebuilding the highway, or any other number of preconstruction items that had nothing to do with the central issue of whether or not a defect or trap did exist. That issue should have been determined by the jury from evidence answering “yes, it did exist” or “no, it did not exist” and by the further determination as to whether the defect was the proximate cause of plaintiffs injuries.
The record in this case is burdened with page after page of testimony relating to the extraneous matters noted foregoing. The jury got sidetracked so that the issue became not whether a hazardous condition existed but whether the State of Montana had a highway engineering department that used good engineering practice. As I stated, if the defect existed, it is not a defense that the defect was brought about by good engineering practice.
I am also of the opinion that there is an irreconcilable conflict between the holding in the majority opinion and our holding in the Byorth case. In Byorth, this Court stated if the State failed to discharge its duty to construct reasonably safe highways, and that failure resulted in injury, the State was liable “regardless of [its] personal financial priorities.” 572 P.2d at 203. Yejt here we are stating that financial priorities are a "factor” in determining negligence. Thus we now accord the State what was condemned in Byorth, “a defense a private party never had.” 572 P.2d at 203.
In Byorth, this Court went on to say:
“Over and above the substantive consideration, the procedural complexities of the offered defense militate strongly against it. It would call forth in every highway ihjury or death case a jury review and decision on the State’s entire highway program, including an infinitude of legislative as well as administrative decisions. The defense would need only to be pleaded to bar all but the very largest of claims, and even with those claims the evidentiary burden would become unmanageable.” 572 P.2d at 203, 204.
*509 That is exactly what happened in the Modrell case. On trial was not the simple issue of negligence in building or not building a defect in the highway, but rather the whole of the department’s procedures in constructing and reconstructing highways. It may be coincidental, but the district judge who authored the above language in Byorth is the same district judge who sat on the Modrell case in the District Court. Byorth was handed down after this Modrell case had been tried in the District Court. When he authored Byorth, the good judge was speaking from a searing experience.
I would reverse and remand with instructions to find for the plaintiff on the issue of liability and to determine damages.