PERRY L. GREENWOOD AND ANOTHER v. EVERGREEN MINES COMPANY AND ANOTHER.
FRED W. BABBE AND ANOTHER v. SAME.
VILLAGE OF CROSBY, RESPONDENT.[1]

June 29, 1945.

Nos. 33,917, 34,075.

[1]Reported in 19 N. W. (2d) 726.

*Ryan, Ryan & Ryan,* for appellants.
*F. E. Murphy,* for respondent.

JULIUS J. OLSON, JUSTICE.

Two cases founded upon identical facts were consolidated for trial in the court below and are so submitted here. We shall refer to the respective plaintiffs as Greenwood and Babbe, and to defendant village of Crosby as the village. Defendant Evergreen Mines Company is not involved here, since as to it both cases were dismissed.

Plaintiffs sought damages for blocking the outlet of Serpent Lake so as to raise the level thereof beyond high-water mark, thereby causing the flooding and damaging of their properties abutting on the lake.

Serpent Lake is a meandered and navigable body of water comprising approximately 1,300 acres. At the westerly end thereof it originally had its outlet in Serpent Creek within the area of the village. In 1917, the village closed the natural outlet and constructed in its place an open ditch some 250 to 300 feet downstream, thereby carrying the water westerly from the lake to the creek. A roadway there required the installation of a culvert to take the lake overflow to the creek, and a 42-inch culvert was installed. Some two or three years later, the village installed a 24-inch culvert in place of the open ditch which had formerly carried the water to the creek. Thus matters remained until 1927,

when the state highway department took over for state highway purposes the road under which the 42-inch culvert had been laid. The department filled in material along the lake shore, thereby widening the roadway to the east along the westerly shore of the lake. It installed a 36-inch intake culvert from the lake so as to connect with the village 42-inch intake culvert. From the time of the original construction of the new outlet and until 1938, no difficulty had been experienced in respect to the flow of water from the lake. These were normally rather dry years. But in the spring of 1938, the water of the lake gradually arose; and in 1942 and again in 1943, a substantial part of the Greenwood property was covered with water. During these dry years, with low outflow, property owners along the creek had appropriated the adjacent areas of the creek bed to various domestic uses. The village had installed culverts across at least five streets through which the creek flowed. These varied in size from one of only nine-inch diameter to ones as large as 18, 24, 30, and 36 inches in diameter.

After a thorough trial, the court submitted to the jury as questions of fact the issues of whether the village had filled in, obstructed, or dammed up the new culvert outlet and thereby raised the waters of the lake to a height in excess of its natural high-water mark. On that phase, the court said:

"The plaintiffs in these two cases are the owners of land bordering on Serpent Lake, and as owners of land abutting on Serpent Lake they were entitled to have the water of the lake maintained at the natural and ordinary level at all times.

"If the village of Crosby, acting through its officers or employes; caused the water to raise above its natural high-water mark to overflow and damage the property of plaintiffs, the village would be liable, and in that case your verdict should be for plaintiffs in some amount.

"It is the law that the natural high-water mark of Serpent Lake would extend to that part of the lake bed which the water has

occupied sufficiently long and continuously as to wrest it from vegetation and to destroy its value for other purposes."

In the Greenwood case, the jury returned a verdict of $4,000 for the plaintiffs. In the Babbe case, the verdict read:

"We, the jury in the above entitled action, find for the Plaintiff [sic] and assess their damages in the sum of Nothing."

When the jury reported its verdicts, the court asked the foreman, addressing the inquiry to each member of the jury; "* * * by that verdict do you mean that you found for the defendant?" There was some discussion, during which a member of the jury said:

"We found that there wasn't any damage to speak of down there at Babbes' place, and that's the reason we didn't allow anything for any damage. There wasn't but a small amount there; it doesn't amount to anything; it didn't hurt his property; just a little lake shore washed out and away from there.

"The Clerk: Ladies and gentlemen of the jury, are these your verdicts?

"Voices: Yes.

"The Clerk: And all of you?

"Voices: It is."

In due season, the village moved for judgment notwithstanding or for a new trial in the Greenwood case. In the Babbe case, plaintiffs moved for a new trial. The village then moved for judgment notwithstanding also in the Babbe case. The court granted the motion of the village for judgment in each case, being 'of opinion, as expressed in its memorandum, that—

"From an examination of the entire record I am satisfied that the record fails to show that the village of Crosby failed to perform any legal duty imposed upon it by law or that it performed any affirmative act that constituted a material element or substantial factor in causing the flooding of plaintiffs' land.

"I am further satisfied that the proximate cause of the flooding of plaintiffs' land was the negligence of the Minnesota State High-

way Department in permitting an excessive stage of water to accumulate in Serpent Lake by its failure to keep its state highway culvert clear of obstructions."

In the Greenwood case, plaintiffs have appealed from the judgment. In the Babbe case, plaintiffs appealed from the order denying their motion for new trial.

■ The decisive question here is whether the evidence, viewed in the light most favorable to plaintiffs Greenwood, is sufficient to present a jury issue. Since the court granted judgment *non obstante,* the rule to be applied is whether, as a matter of law, defendant was entitled to judgment on the merits. The question is not whether the trial court could or ought, in its discretion, to have granted a new trial, but whether, from the whole record, the evidence was such as to require a judgment for the moving party. Thom v. N. P. Ry. Co. 190 Minn. 622, 627, 252 N. W. 660, 662. Our cases are found in 3 Dunnell, Dig. & Supp. § 5085.

■ The fact issue upon which both causes depend is whether acts or omissions of the village were the proximate cause so as to constitute a material element in the rise of the water in the lake and as such were responsible for the resulting damage. On this phase the court charged (Record, p. 505, f. 1515):

"These cases are based upon the claim the village was negligent in taking care of the water that flowed out of Serpent Lake, and obstructed the flow of such water. The village cannot be held liable in these cases unless the damage complained of was caused by the lack of reasonable care and skill on the part of the village in taking care of the water that flowed through this state culvert."

And at p. 507, ff. 1519 and 1520:

"It is the law further that where an injury is caused on account of the concurrent negligence of two or more persons the negligence of each is the proximate cause of the injury, and each is liable for all the resultant damages if the injury would not have occurred without his negligence.

"And so if you find that the state of Minnesota was negligent in maintaining its culvert in the state highway, nevertheless if you also find the village was also negligent and if that negligence on the part of the village constituted a material element or substantial factor in damaging the lands of plaintiffs, the village would be liable, and even though the state of Minnesota had also been negligent in maintaining its culvert."

There is no question that plaintiffs in both cases are riparian owners of property on the lake. Hence, they are as a matter of right entitled to have the lake level remain at its natural high-water mark, and anyone obstructing or interfering with the natural flow of waters from the lake so as to raise the water level above high-water mark is liable for the resulting damages. In this respect, the trial court adequately stated that principle in the quoted charge.

■ We find the rule as applied to municipalities well summarized in 6 Dunnell, Dig. & Supp. § 10172, which reads:

"A municipality is liable for the diversion of surface water caused by a change in the grade or other improvement of its streets, where a private owner making similar improvements on his own land would be liable."

Numerous cases sustaining the quoted text are found under note 33. So, also, liability on the part of a municipality arises when it diverts surface water flowing in a natural channel so as to overflow adjoining property. In such a case, it is bound to exercise reasonable care in providing an outlet for the water. Mr. Justice Mitchell, in McClure v. City of Red Wing, 28 Minn. 186, 192, 9 N. W. 767, 768, stated the rule in this language:

"* * * On principle, we believe that, so far as the circumstances of the case and public necessity will permit, the same rules should be applied to such corporations [municipalities], in the management and improvement of their streets, as would be applied to a private individual, in the management and use of his private property."

Other cases sustaining that principle are O'Brien v. City of St. Paul, 25 Minn. 331, 33 Am. R. 470; Taubert v. City of St. Paul, 68 Minn. 519, 71 N. W. 664; Fossum v. C. M. & St. P. Ry. Co. 80 Minn. 9, 82 N. W. 979. In Reed v. Board of Park Commrs. 100 Minn. 167, 171, 110 N. W. 1119, 1120, this court said:

"* * * In regard to drainage and the disposition of surface water, a town has the same rights and is subject to the same liabilities as an individual. Oftelie v. Town of Hammond, 78 Minn. 275, 80 N. W. 1123. 'A city or town which constructs a street across a water course without proper culverts or drains, * * * so as to cause the water to flow back upon and injure the land of another, is liable to an action of tort to the same extent that any corporation or individual would be liable for doing the same acts.' Gould, Waters (3d Ed.) § 250, and cases there cited."

Cf. Stoehr v. City of St. Paul, 54 Minn. 549, 56 N. W. 250. In O'Brien v. City of St. Paul, 25 Minn. 331, 33 Am. R. 470, and Batcher v. City of Staples, 120 Minn. 86, 139 N. W. 140, the stated doctrine was held applicable to situations where the municipality emptied its sewer into a natural watercourse and thereby increased the flow and fouled the water to the damage of the riparian owners.

■ There can be no doubt that the village council had authority to change the outlet. Minn. St. 1941, § 412.19 (Mason St. 1927, § 1186), grants broad powers in respect thereto. Subd. 9 (§ 1186, subd. 8) gives the council power to "establish and maintain drains, canals, and sewers, and to alter, widen, or straighten watercourses." But the grant of such power is subject to the statutory requirements and limitations stated in §§ 616.01 and 616.02 (§§ 10241 and 10245). We there find (§ 616.01 [§ 10241]):

"A public nuisance is a crime against the order and economy of the state and consists in unlawfully doing an act or omitting to perform a duty, which act or omission shall:

* * * * *

"(3) Unlawfully interfere with, obstruct, or tend to obstruct or render dangerous for passage, a lake, navigable river, bay, stream,

canal, or basin, or a public park, square, street, alley, or highway."

And § 616.02 (§ 10245) provides for the punishment of those "who shall wilfully omit or refuse to perform any legal duty relating to the removal of such nuisance."

Section 561.01 (§ 9580) defines nuisance thus:

*"Anything which is injurious to health,* or indecent or offensive to the senses, *or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, is a nuisance.* An action may be brought by any person whose property is injuriously affected or whose personal enjoyment is lessened by the nuisance, and by the judgment the nuisance may be enjoined or abated, as well as damages recovered." (Italics supplied.)

Section 561.03 (§ 9582) provides that any owner or occupant of property who is injured, "either in his comfort or in the enjoyment of his estate * * *, may have an action of tort for the damage sustained thereby and may have such nuisance abated."

■ Chapter 161 relates to the department of highways. By § 161.02 (§ 2553), the office of commissioner of highways was created, "the incumbent whereof shall have the powers, duties and privileges herein declared." Section 161.03 (§ 2554) defines the powers so granted. Subd. 3 thereof, so far as here material, provides:

"No portion of the trunk highway system lying within the corporate limits of any borough, village, or city shall be constructed, reconstructed, or improved unless the plans and specifications therefor shall be approved by the governing body of such borough, village, or city before such work is commenced, nor shall the grade of such portion of the trunk highway system lying within such corporate limits be changed without the consent of the governing body of such borough, village, or city."

■ In granting the motion for judgment, the trial court assigned as its reasons for so doing (1) lack of proof that the village had failed to perform any legal duty, or (2) that it had performed any

affirmative act causing the flooding of plaintiffs' lands. But the court clearly saw and recognized that, especially as to the Greenwoods, there had been substantial damage to their property. Its reason for placing the entire blame upon the highway department was that its officers and agents had negligently permitted the outlet to become obstructed and that this was the sole cause of raising the water in the lake. We must therefore revert to the question stated in the first subdivision of this opinion, *i. e.:* Do the facts shown by the record present jury issues? This necessitates a further recital of many disputed fact issues as to which the jury found for plaintiffs.

There is no question that the village closed the natural outlet and substituted a new one in its place. Over a period of some ten years thereafter it was in full and absolute control of the new outlet. It was the only actor, and it alone assumed and asserted full authority in the premises. Necessarily, therefore, it assumed the duties and responsibilities of any private individual or corporate body who has changed, for his or its own purposes and advantages, a natural outlet of a stream and substituted an artificial one. It must be equally clear that the Greenwoods especially have suffered real and substantial damages. The verdict demonstrates that. It is also true that the highway department woefully neglected the performance of its duty to keep the outlet culvert open, and that it failed to remove boards, planks, and other obstructions placed at the upper end of the culvert by someone who had an interest in keeping the water from flowing freely through it. This brings for decision here the question of whether the village may be held liable as a joint tortfeasor. Plaintiffs' proof showed that immediately below the original installation of the 42-inch culvert the village had left an open ditch, which it later replaced with a 24-inch culvert. Below that it placed a nine- or ten-inch culvert some 14 or 16 feet in length. In that situation, the natural tendency of any culvert, as distinguished from a natural outlet, would be that it would become more easily blocked by deposits of dirt, weeds, and other objects gathered by rising

water in the lake. In the narrow space of such a culvert, no one can doubt that these deposits resulted in a decrease of flowage as compared with the natural outlet. Natural causes had brought into being the natural outlet for carrying away debris without thereby causing a backup of the overflow from the lake. That deposits do gradually accumulate in culverts from time to time is a matter of common knowledge. As time goes on, these deposits retard the flow of water through the cudverts, and, as here, eventually clog the flow. Here, as we have seen, because of increased rainfall, the lake began to rise in 1938. Prior thereto and for many years, there had been very little rainfall, and the levels of the lake had gone down during these years of protracted drought. In the fall of 1941, the lake-water level had risen sufficiently to cause the highway department to send one of its men there to investigate the situation. He found that there were boards or planks placed at the lake end of the state culvert. During the following spring, another of its representatives was sent, with instructions to remove the planks and boards so as to let the water through. He consulted the village clerk and its street commissioner. Both urged him not to remove the planks. The commissioner asked for time so that he might see the village president about it. The commissioner testified that he spoke to the president about the situation, told him what the state wanted to do, and asked for instructions. The president shrugged his shoulders and drove on, leaving the whole matter as it was. The commissioner admitted that if the outlet culvert had been opened to its capacity the culverts under the cross streets would not have been adequate to take care of the water, and that, as a result, there would have been an overflow of the area lying north of where the new outlet entered the creek. During much of the time between the fall of 1941 and well into the summer of 1943, the situation was gradually growing worse.

Then, too, during these times many complaints from lake-shore owners were brought home to the village officers. Objectors were heard at a council meeting in June 1942. The village president

told the people there that the water could not be taken care of by the culverts then in the streets, because they were too small, and that the village could not afford to put in new ones. Mr. Greenwood talked to the president many times and asked him to remove the boards and planks at the lake outlet. His answer was that he did not dare to do so, because it would flood all the territory downstream, as the culverts there were too small, even insisting that the village had a right to keep the planks there. Another property owner appearing at this meeting told the members of the council that if the village did not remove the planks he would. The village attorney promptly told the objector that if he did so he would be placed behind the bars of the village jail.

Things finally became so bad that the village council concluded to advertise for bids to redig the creek bed. This was done in July 1943. Bridges across the channel of the creek were constructed at street intersections. The village crew, under the direction of its street commissioner, installed additional planks at the lake outlet to permit the cleaning out of both the 36- and 42-inch culverts. This done, the lake level was promptly lowered to its normal height. The obvious remedy had been applied, but too late to correct the evils and resulting damages theretofore caused. There is no suggestion that the village officers asked the highway department for authority to proceed as it did. We conclude that the record fairly justifies the view that the village officers failed to take timely steps to avoid the creation of a nuisance and, after its creation, actively sought and obtained the highway department's reluctant assent to its continuance. That it had the means under the law to prevent, and later at least to correct, the maintenance of such nuisance seems clear. The conduct of the village officers was more than passive; it was active; it became a participant.

■ The rule to be applied in such a situation as we have here was well stated by this court in Virtue v. Creamery Package Mfg. Co. 123 Minn. 17, 40, 142 N. W. 930, 939, L. R. A. 1915B, 1179, as follows:

"* * * the rule which is well recognized that all who actively participate in any manner in the commission of a tort, or who procure, command, direct, advise, encourage, aid, or abet its commission, or who ratify it after it is done, are jointly and severally liable" for the resulting injury, "even though they act independently and without concert of action or common purpose, provided their several acts concur in tending to produce one resulting event."

Our supporting cases are cited in 6 Dunnell, Dig. & Supp. § 9643, notes 96 and 97. And in 52 Am. Jur., under the title "Torts," § 114, the same basic thought is stated. Under the title "Trespass," § 33, the author states that the same rule applies in trespass cases. *Cf.* 4 Restatement, Torts, § 876.

■ McQuillin, in his notable work, 6 Municipal Corporations (2 ed.) § 2876 (2702), under the title "Obstruction of Watercourse," says that it is important to distinguish between surface water and watercourses. Surface water is there defined to be that which is diffused over the surface of the ground as the result of falling rains or melting snows, and it continues to be such until it reaches a well-defined channel in which it is accustomed to flow with other waters so as to become the running water of a stream, when, of course, it ceases to be surface water. Such stream, a watercourse, was the natural outlet of Serpent Lake. In § 2877 (2703), the author deals with culverts over such watercourses. He thus states the general rule:

"Where a municipal corporation constructs a culvert for the passage of the waters of a watercourse or natural drain, it will be liable for damage due to a negligent construction of the culvert where such negligent construction is the proximate cause of flooding adjacent lands, or its inadequacy (according to the rule in many states) to carry away water ordinarily coming into it, *or for failure of the municipality to remove obstructions therein; and a culvert obstructing a watercourse, to the injury of riparian owners, is a nuisance, and damages are recoverable.*" (Italics supplied.)

The author further states that a culvert so installed must be suffi-

cient to take care of not only the natural and normal flow of the stream but such abnormal and excessive flow as may reasonably be anticipated in time of high water and flood; and, where an inadequate culvert is constructed by a municipality and a private owner, they are jointly and severally liable for injuries to property caused thereby.

In Gould, Waters (3 ed.) § 225, the rule is stated to be:

"* * * A person who diverts a stream through an artificial watercourse, for his own benefit, must construct it in such a manner that it will carry off, as efficiently as did the stream, the water that may flow into it from such floods and rains as happen in the locality."

And, in § 219, he states:

"Riparian owners have, also, a natural right to have natural streams flow unimpaired in quality as well as quantity; and any use of the stream by one proprietor, which defiles or corrupts it to such a degree as essentially to impair its purity and usefulness for any of the purposes to which running water is usually applied, is an invasion of private right for which those injured thereby are entitled to a remedy."

And in 6 McQuillin, Municipal Corporations (2 ed.) *supra*, § 2877 (2703), we find:

"* * * The duty of a municipality with respect to culverts to take care of surface water coming through a natural drain does not end with the original installation, but is a continuing one, to be exercised with due regard to changed conditions affecting the flow of water to be accommodated by the culverts."

In our own case of Maguire v. Village of Crosby, 178 Minn. 144, 147, 226 N. W. 398, 399, we held that—

"the work upon village streets appropriated by the order of the commissioner for a trunk highway is subject to the control of the village both as to plan of construction and grade of the street. It

required the joint action of the commissioner and village council to change the grade as was done" in that case.

Here, there was no change of street grade. But the *plan of construction* required by § 161.03, subd. 3 (§ 2554, subd. 3), to "be approved by the governing body" of the village, placed upon the village and the commissioner of highways the relative relationship indicated in the above quotation.

Also to be noted is the fact that in the spring of 1942 the street commissioner, pursuant to order of the council, took out the nine-inch culvert and installed in its place one of 24 inches—*"the purpose in taking out the 9-inch pipe and putting in the 24-inch pipe was to let the water out of the lake."* (Italics supplied.)

We think, upon all the facts recited, that jury issues were presented in both cases and that the court erred in granting judgment *non obstante.*

As to the Greenwoods, since the motion for judgment was granted, there was no judicial action upon the motion for a new trial. Upon the going down of the remittitur, the judgment stands reversed, but the motion for a new trial will be for the trial court. Wegmann v. Minneapolis St. Ry. Co. 165 Minn. 41, 43, 205 N. W. 433. Our cases are annotated and cited in 3 Dunnell, Dig. & Supp. § 5086, and cases in note 58.

■ With regard to the verdict in the Babbe case, we think the evidence was such as to require the award of substantial damages. As to them, the evidence discloses that they lost some 29 birch trees on their lake-shore property; that the shore line was washed out to the extent of several feet; that the footing under the ice-house was put out of commission and much of their ice melted because of high water in the lake; and that their private road leading to their property was damaged so that they had to haul in some 60 loads of dirt and cinders to make it usable. The evidence suggests rather persuasively that their damages were substantial. Several witnesses estimated these at from $400 to $500. A witness called as an expert by the village estimated their damage at $500.

In situations such as this, we may well apply the rule recognized and applied in Whittaker v. Stangvick, 100 Minn. 386, 388, 389, 111 N. W. 295, 296, 10 L.R.A.(N.S.) 921, 117 A. S. R. 703, 10 Ann. Cas. 528, *viz.*:

"With respect to damages as an essential, the common law recognizes two kinds of actions. In the first class there is a direct invasion of another's person or property without permission, which is actionable per se, or which gives rise to a presumption of at least some damage, without proof of any actual damage. Unpermitted contact with the person constitutes assault and battery. Unpermitted invasion of premises constitutes a trespass quare clausum fregit. In the second class, actions on the case, in which the damages are indirect and consequential, there can be no recovery unless the plaintiff shows, as an essential part of his case, that damages, pecuniary in kind, proximate in sequence, and substantial in extent have resulted. In trespass quare clausum fregit, it is immaterial whether the quantum of harm suffered be great, little, or inappreciable."

Beyond doubt, the Babbe property suffered from "unpermitted invasion" and constituted "a trespass quare clausum fregit." Their property was damaged from an "invasion" by one who had "no right to come there." And it is "entirely immaterial by means of what instrumentality the trespass is committed."

The judgment in the Greenwood case is reversed, as is also the order denying a new trial and granting judgment in the Babbe case.

So ordered.