ALLEN SCHOENING AND ANOTHER v. UNITED STATES
AVIATION UNDERWRITERS, INC., AND ANOTHER.

120 N. W. (2d) 859.

March 15, 1963—Nos. 38,700, 38,701.

*Gordon Rosenmeier* and *John E. Simonett,* for appellants.
*Garrity, Cahill & Gunhus,* for respondents.

NELSON, JUSTICE.

This appeal involves two separate actions brought to recover for

damages to aircraft resulting from collapse of a hangar at the Appleton Municipal Airport. The complaints alleged negligence and breach of bailment contract as causes of the loss and named the village of Appleton and United States Aviation Underwriters, Inc., its insurer, as defendants.

After a hearing on defendants' motions for summary judgment, the district court ordered the actions dismissed. In each action an appeal was taken from the order of dismissal.

The court's orders dismissing the actions state that the motions were made on the grounds that "the pleadings, the discovery depositions on file herein, the affidavit and all the files and records herein" establish defendants' right to judgment in their favor as a matter of law. Plaintiffs have added an appendix to the record to present to this court "the files and records" upon which the trial court based its orders. This appendix includes an affidavit of Orville L. Pring, mayor of Appleton, and a lease of a hangar made in December 1954 between the village and plaintiff D. P. Miller and one W. L. Wilson, as well as narrative abridgments of the discovery depositions. With respect to the nature of the orders dismissing the actions, we have concluded that the orders are final judgments of dismissal involving the merits.

An examination of the record indicates that the facts are as follows: In 1946 plaintiff D. P. Miller and W. L. Wilson each owned an airplane. The planes were stored in the Appleton Municipal Airport along with seven others. Since the hangar was overcrowded, Miller and Wilson went before the village council requesting that the village construct another. The council denied their request because no funds were available, but agreed to allow Miller and Wilson to construct a hangar, provided that they pay for it and that its construction conform with specifications to be determined by the State Aeronautics Department. Specifications were obtained which provided for a concrete block hangar large enough to accommodate four planes. The hangar was subsequently constructed on city property at the site directed by the city engineer. It was paid for by Miller and Wilson. From the time of its construction in 1947, it was used by plaintiff Miller for storing his aircraft.

Plaintiff Schoening has used it since 1950 when he purchased an airplane from Wilson. In 1954 Miller and Wilson requested the village council to draft an agreement to assure them continuous future use of the hangar. The council submitted an agreement in the form of a 99-year lease by which Miller and Wilson obtained use of the hangar for a yearly rental of $1. They had made such a payment annually from the time the hangar was constructed. Dr. R. P. Miller, who was mayor of Appleton when the hangar was built and is a brother of plaintiff Miller, explained the purpose of the $1 fee as follows:

"About the dollar-a-year payment: though I can't recall exactly—there was no legal counsel present—it was felt that a token payment of a dollar a year would be legal procedure. I don't mean by this that Dr. Dave and Mr. Wilson leased back the hangar. I don't feel that was true. I'd hate to say just what the basis of it was, except that in common parlance, like it is for a deed, we felt you had to stipulate something and they [apparently the council] thought if you pay a dollar a year, why that made it legal. * * *

"This one dollar definitely didn't give them exclusive use and occupancy of the building; obviously they didn't have that because it was a four-place hangar and other planes were put in there."

Both Miller and Wilson, from the time the new hangar was constructed, received payments from various persons who used vacant portions of the hangar. National Guard planes and other transient aircraft were stored in the hangar at infrequent intervals. In 1957 Miller purchased a Piper Apache airplane for which he paid $40,064.73. He had the hangar partitioned in order to give him a separate storage area for his plane.

The village of Appleton purchased a policy of liability insurance in 1960 from defendant United States Aviation Underwriters, Inc. The policy provided that the company would pay all sums which the insured village might become legally obligated to pay for bodily injury and property damage. The policy also included a hangar-keeper's liability endorsement, which extended liability coverage under the property damage clause to aircraft in the care, custody, and control of the village (which the standard property damage liability

provisions did not cover). On July 2, 1960, in a severe windstorm, the hangar was destroyed and plaintiffs' airplanes stored therein were damaged. The policy was then in force.

Defendant insurer contends that the village is immune from suit arising out of the operation of its airport. Plaintiffs, however, insist that the village and its insurer are liable to the extent of the insurance coverage, and that to that extent at least both defendants have waived the defense of sovereign immunity or are estopped to assert it.

Prior to the adoption of the Uniform Airports Act[1] in 1945 the operation of a municipal airport in this state was a proprietary function. See, Heitman v. City of Lake City, 225 Minn. 117, 121, 30 N. W. (2d) 18, 22. This act altered a traditional concept of long standing by declaring that airport maintenance and operation were to be (L. 1945, c. 303, § 12, subd. 1, now Minn. St. 360.033, subd. 1) "public, governmental and municipal functions." It provided further (L. 1945, c. 303, § 12, subd. 2, now Minn. St. 360.033, subd. 2):

"No action or suit sounding in tort shall be brought and maintained against the state, any municipality, or the officers * * * thereof, on account of any act done in or about * * * maintenance, operation, * * * or management of any airport * * *."

In 1949 upon enactment of a new village code,[2] the legislature added a provision (L. 1949, c. 119, § 29, subd. 4, now contained in Minn. St. 412.221, subd. 4) declaring:

"The village council shall have power to procure insurance against liability of the village or of its officers and employees for torts committed within the scope of their official duties, whether governmental or proprietary."

That section was amended by L. 1961, c. 230, § 3, by addition of the following provisions:

"* * * The procurement of insurance by the village shall consti-

---

[1]L. 1945, c. 303, §§ 10 to 23, now Minn. St. 360.031 to 360.045.
[2]L. 1949, c. 119.

tute a waiver of the defense of governmental immunity to the extent of such coverage in the insurance policy, and the writing of such policy by the insurance company shall constitute permission by the insurance company to the village to waive governmental immunity to the extent of the coverage in the policy. The waiver of defense of governmental immunity made pursuant to such provision in the policy of insurance shall not subject the village to liability in excess of the insurance coverage provided by the policy."[3]

■ This court carefully scrutinized the doctrine of sovereign immunity in the recent case of Spanel v. Mounds View School Dist. No. 621, 264 Minn. 279, 292, 118 N. W. (2d) 795, 803, and declared:

"* * * the court is unanimous in expressing its intention to overrule the doctrine of sovereign tort immunity as a defense with respect to tort claims against school districts, municipal corporations, and other subdivisions of government *on whom immunity has been conferred by judicial decision* arising after the next Minnesota Legislature adjourns, subject to any statutes which now or hereafter limit or regulate the prosecution of such claims." (Italics supplied.)

One of the purposes of giving our decision prospective effect in that case was (264 Minn. 294, 118 N. W. [2d] 804) to permit units of government "to plan in advance by securing liability insurance or by creating funds necessary for self-insurance."

In Bailey v. City of Knoxville (E. D. Tenn.) 113 F. Supp. 3, plaintiff, who had been injured in a fall at the municipal airport, moved to amend her complaint to seek damages in the amount of the liability insurance carried by the city. The court, in permitting the amendment, pointed out (113 F. Supp. 5):

"A long line of Tennessee cases hold that liability of a municipality

---

[3]The notes of the House Committee on Municipal Affairs indicate that the purpose of the amendment was to allow municipalities to purchase policies of liability insurance, if they desired to do so, and thereby to waive the defense of governmental immunity, a privilege cities and school districts already had. Minutes, Meeting, Municipal Affairs Committee, Minnesota House of Representatives, March 9, 1961.

or other governmental subdivision for injuries resulting from negligent acts may be sustained to the extent of the insurance carried by it at the time of the accident."

See, also, City of Knoxville v. Bailey (6 Cir.) 222 F. (2d) 520.

That a municipality may waive its immunity was established in Howard v. Village of Chisholm, 191 Minn. 245, 253 N. W. 766, and in Holen v. M. A. C. 250 Minn. 130, 138, 84 N. W. (2d) 282, 288, this court held it to be well settled that a legislature may cure, by retrospective act, irregularities in the exercise of power which it has conferred on a municipal corporation.

Christie v. Board of Regents, 364 Mich. 202, 111 N. W. (2d) 30, is a recent case persuasive as to existence of the power to waive governmental immunity. While the decision of the majority was limited to a holding that discovery procedure had properly been used to obtain inspection of a liability insurance policy, the opinion, written by Mr. Justice Black, discussed the power of the Board of Regents of the University of Michigan to waive governmental immunity from tort liability by purchasing public liability insurance with university funds, and observed (364 Mich. 205, 111 N. W. [2d] 32):

"The first point—that the board's determination to acquire and carry liability insurance removes the historic reason for immunity—requires no extended analysis. * * *

"Whatever view one may take of this diversity [i. e., between the majority rule holding that public bodies do not waive governmental immunity by purchase of liability insurance and the minority, 'enlightened' rule holding that they do], the majority rule becomes irrelevant when it is shown that the critical bastion thereof (that the legislature only may waive) is nonexistent."

The rule rejected by the Michigan court was applied in Holland v. Western Airlines (D. Mont.) 154 F. Supp. 457. In holding that the purchase of liability insurance by a city does not constitute a waiver of immunity, the court stated (154 F. Supp. 461):

"* * * In the absence of any applicable statute waiving immunity or any policy provisions containing such waiver, I feel compelled to

follow the general rule and hold that the fact that the City of Great Falls has obtained a policy of liability insurance does not in itself result in any waiver of sovereign immunity."

The court stated also that the Tennessee rule recognized and applied in Bailey v. City of Knoxville, *supra*, has little support in other jurisdictions, citing Hummer v. School City of Hartford City, 124 Ind. App. 30, 112 N. E. (2d) 891, which held directly that the purchase of liability insurance by a municipal corporation did not constitute a waiver, and Rittmiller v. School Dist. No. 84 (D. Minn.) 104 F. Supp. 187. The Rittmiller case is not in point as it considers the liability of a school district under Minn. St. 471.42 and 471.43. The language of the opinion, out of context, appears forceful; however, it is not authoritative here.

The rationale of the Holland case appears to be that (154 F. Supp. 460):

"It is for the legislature to prescribe whether, and under what circumstances, an individual may maintain a civil action against a municipality for an injury caused by a breach of a public duty, and the power of the legislature in this respect is exclusive and controlling."

Since our decision in the Spanel case it is clear that we do not agree that the subject is exclusively within the purview of the legislature in this state; for we there recognized, as other courts have, that the doctrine of sovereign immunity is largely a product of the courts.

Defendants cite Maffei v. Town of Kemmerer, 80 Wyo. 33, 338 P. (2d) 808, 340 P. (2d) 759, as authority for the proposition that only the legislature may waive the defense of sovereign immunity. After tracing the doctrine to the common law, that court stated (80 Wyo. 43, 338 P. [2d] 811):

"Section 16-301, W. C. S. 1945, says the Common Law of England prior to the fourth year of James I (1607) 'shall be the rule of decision in this state.' Thus by statute the doctrine of municipal immunity became the rule of decision in our State and it is only by statute that the doctrine should be abrogated."

Minnesota has no similar enactment, and the Wyoming case therefore has no application here.

█ Since the loss on which the instant case is based occurred before the enactment of L. 1961, c. 230, respondents contend that c. 230 can have application to this controversy only if it is given retroactive effect. In support of their contention that the 1961 enactment should not be so construed, they cite Minn. St. 645.21, which provides:

"No law shall be construed to be retroactive unless clearly and manifestly so intended by the legislature."

While this court presumptively will not give retroactive effect to a statute unless a purpose that it have such effect is implicit therein, neither will this court construe a law in a manner which will result in absurdity, injustice, or patent inconvenience. 17 Dunnell, Dig. (3 ed.) § 8947; Minn. St. 645.17. The construction of L. 1961, c. 230, § 3, urged by defendants as the basis for their claim that immunity cannot be waived to the extent of the liability insurance coverage carried by the village leads to an unjust conclusion, since the record clearly indicates that at the time the liability insurance was acquired the purpose was to protect the aircraft stored at the municipal ariport. While defendants interposed joint answers and motions, it appears that the insurer raised the municipality's defense of governmental immunity, even though there is substantial question as to whether the municipality intended that it be raised. An affidavit by the mayor indicates that this defense was unauthorized. We are not here persuaded to say that the village acquired the policy and paid the premiums with the hope and in the expectation that even if a loss occurred the insurer would never have to pay for any damages to the property covered.

█ In order to determine the effect of the 1961 enactment, we must consider its nature. Plaintiffs assert that the 1961 amendment is "validative" in nature, effective upon enactment, salutary in purpose, and that therefore no justification exists for a judicial interpretation limiting its meaning to policies written after enactment. The assertion that it is validative might appear to be technically incorrect since the purpose of a validating statute is "to cure *past* errors, omissions, and neglects, and thus to make valid what, before its enactment, was in-

valid." Northampton Borough's Appeal, 149 Pa. Super. 142, 28 A. (2d) 257.

In so far as L. 1961, c. 230, is "a legislative act designed to change some prior and existing law by adding to or taking from it some particular provision" (State ex rel. Nagle v. The Leader Co. 97 Mont. 586, 593, 37 P. [2d] 561, 563), it is an amendment. To amend means "[t]o change or alter, as a law, * * * by the will of a legislative body, or by competent authority." Ex parte Dillon (N. D. Cal.) 262 F. 563, 567. Chapter 230 clearly appears to be in the nature of a "supplemental" act, defined in State ex rel. Gamble v. Hubbard, 148 Ala. 391, 397, 41 So. 903, 906, as follows:

"* * * A supplemental act merely adds something that was left out of the original act. It does not necessarily revise it or amend it in the more technical sense."

We therefore hold that while the provision explicitly declaring that procurement of liability insurance by a village constitutes a waiver of the defense of governmental immunity to the extent of such insurance coverage did not appear until 1961, the power of villages to waive the defense was implicit in the village code enacted in 1949 and was therefore the law in this state prior to 1961.

The legislative history of the statutes considered on this appeal indicates the gradual trend away from the immunity concept to which we have traditionally adhered. The Uniform Airports Act enacted in 1945 clothed airport operations with immunity. The 1949 enactment of the village code, however, obviously gave municipalities the first opportunity to insure against liability for torts. The 1961 amendment was not the declaration of a new legislative policy but purely a limitation on the already-existing ability to waive the defense. The legislature in enacting the 1961 amendment undoubtedly intended to preserve the defense of immunity as to tort liability in excess of the amount of insurance carried.

▆▆▆ We are clearly of the view that where a municipality expends public funds for the purchase of liability insurance, such expenditure constitutes a waiver by the municipality and its insurer to the extent of the policy coverage. Were we to hold otherwise, the funds so ex-

pended would be mere gifts to the insurance carriers. In accepting the premium payments the insurer thereby accepts the risk growing out of the municipality's ownership and operation of municipal facilities. The real effect of this rule is not to deprive the municipality of any right inherent in, and essential to, its governmental functions, but is only to make an insurance carrier liable for the losses which it has contracted to cover in its policy. We are thus constrained to hold that, to the extent of liability insurance carried by a village, the governmental immunity from suit conferred by Minn. St. 360.033, subd. 2, of the Uniform Airports Act, is no longer a defense inuring to the benefit of either the village or its insurer in an action to recover for injuries resulting from negligent acts within the insurance coverage.

■ The insurer contends that the policy of insurance makes rendition of an enforceable judgment in plaintiffs' favor against the village a condition precedent to any liability on its part. Admittedly the policy contains a clause stating:

"* * * no action shall lie against the company unless, as a condition precedent thereto, * * * the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company."

We must recognize that a liability contract on the part of the insurer has been pleaded and not an indemnity contract intended to benefit plaintiffs directly. Under the circumstances the validity of plaintiffs' claims must first be established before the insurer is obliged to make payment to anyone. See, Gjovik v. Bemidji Local Bus Line, 223 Minn. 522, 27 N. W. (2d) 273; Miller v. Market Men's Mutual Ins. Co. 262 Minn. 509, 115 N. W. (2d) 266.

■ However, the misjoinder of the insurer will not support the summary judgments of dismissal. Clearly, the district court is vested with wide discretion relative to joinder of parties, as well as to separate trials, and may drop or add parties of its own initiative at any stage of the action on such terms as are just. Rule 21, Rules of Civil Procedure. In Diepen v. Fernow (W. D. Mich.) 1 F. R. D. 378, 379, the court held that under the corresponding Federal rule—

130

"* * * misjoinder of parties is not a ground of defense and, therefore, not a ground for dismissal. The suitable remedy in such a case is to drop the party who has been improperly joined."

See, also, Wiesner v. Young, 50 Minn. 21, 52 N. W. 390.

■ On the question of whether a bailment existed between plaintiffs and defendant village, it appears that substantial and genuine issues of fact exist sufficient to preclude a summary judgment thereon. Apparently defendants took a contrary position in the court below since they urged that plaintiffs' third and fourth causes of action, which are based upon a claimed bailment, be stricken. Plaintiffs contend that genuine issues of material fact exist on that question and we agree. Upon the record presented on this appeal whether or not there was a bailment was a question of fact on which reasonable men could well differ.

A motion for summary judgment may be granted only when the pleadings, depositions, affidavits, and admissions on file show that there is no genuine issue as to any material fact and that a party is entitled to a judgment as a matter of law. Rules of Civil Procedure, Rule 56.03; Couillard v. Miller Hospital, Inc. 253 Minn. 418, 92 N. W. (2d) 96; 10 Dunnell, Dig. (3 ed.) § 4988b. In Sauter v. Sauter, 244 Minn. 482, 484, 70 N. W. (2d) 351, 353, we stated the rules governing a motion for summary judgment as follows:

"A motion for a summary judgment may be granted pursuant to Rule 56.03 only if, after taking the view of the evidence most favorable to the nonmoving party, the movant has clearly sustained his burden of showing that there is no *genuine issue* as to any *material fact* and that he is entitled to judgment as a matter of law. It is essential to bear in mind that the moving party has the burden of proof and that the nonmoving party has the benefit of that view of the evidence which is most favorable to him. The salutary purpose and useful function of summary judgment proceedings as a means of securing the just, speedy, and inexpensive determination of the action. (Rule 1) is well recognized, but resort to summary judgment was never intended to be used as a substitute for a court trial or for a trial by jury where any genuine issue of material fact exists. In other words a summary

judgment is proper where there is no issue to be tried but is wholly erroneous where there is a genuine issue to try."

Since there appear to be genuine issues of material fact, it was error to have ordered summary judgments in these actions and they are therefore remanded to the court below for proceedings in accordance with the views expressed in this opinion.

Reversed and remanded.

MR. JUSTICE ROGOSHESKE took no part in the consideration or decision of this case.

MR. JUSTICE SHERAN, not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.