**David CHABOT, Respondent
(C5–86–2212), Appellant
(C7–87–357),**

v.

**CITY OF SAUK RAPIDS, Appellant
(C5–86–2212), Respondent
(C7–87–357).**

Nos. C5–86–2212, C7–87–357.

Court of Appeals of Minnesota.

Sept. 22, 1987.
Review Granted Nov. 24, 1987.

Thomas A. Janson, Schmitt, Marso & Janson, St. Cloud, for David Chabot.

Scott B. Lundquist, Austin & Roth, Minneapolis, for City of Sauk Rapids.

Thomas L. Grundhoefer, St. Paul, amicus curiae, League of Minnesota Cities.

Heard, considered and decided by LESLIE, P.J., and SEDGWICK and LANSING, JJ.

## OPINION

LANSING, Judge.

Sauk Rapids appeals from denial of its motion for a new trial and from a judgment that the city was negligent in failing to remedy an inadequacy in its storm sewer system, resulting in damage to David Chabot's house. Chabot appeals the trial court's computation of pre-verdict interest. We affirm in part and reverse in part.

## FACTS

David Chabot purchased a house from Wilbert Landwehr in early 1983. The house had been built by Landwehr across the street from a holding pond used and maintained by Sauk Rapids as part of its storm sewer drainage system. On June 25 and 26, 1983, during a heavy rain, the holding pond overflowed and eroded the front yard of the house, exposing basement walls down to the foundation and causing structural damage to the house. The water also damaged the house interior, personal property, several mature trees, and a cement trough and drainage tile system installed by Landwehr to accommodate surface water runoff unrelated to the holding pond.

Landwehr built the house in 1972 after obtaining a construction variance from Sauk Rapids. Several city officials opposed the variance because of potential flooding. Earl Bukowski, a member of the Sauk Rapids Planning Commission, cautioned the city council and planning commission about liability for flood damage. He testified at trial that he had grown up within a few blocks of Chabot's house and before its construction had seen water in the holding pond rise to street level. Richard Gronau, a city council member in 1972 and Sauk Rapids Superintendent of Public Works from 1980 until the present, also warned that the holding pond might overflow and cause damage.

After the variance had been granted and the house built, there was increased development in the Pleasantview watershed which caused additional runoff and drainage into the holding pond. The city also installed culverts in the watershed channeling water directly into a ditch leading to the holding pond.

From 1977 to 1980, Sauk Rapids City Engineer Mark Johnson evaluated the storm sewer system and concluded that the holding pond across from Chabot's house acted as a dam, holding water from the Pleasantview watershed. He informed

council members that the pond capacity was too small and could cause overflow damage. He also took council members and the street superintendent to observe the problems with the pond.

At Johnson's urging, the city commissioned Barr Engineering to further evaluate the city's storm sewer drainage system. Barr issued its report in 1981 identifying the holding pond as a priority project for improvement in order to prevent damage from the pond overtopping the street.

Dr. Charles Nelson conducted hydrologic studies which showed that the pond's capacity could be exceeded with only 1.3 inches of rainfall in a half-hour period, an event which could occur at a frequency of 10 percent per year, or once every ten years. The half-hour interval is significant because all the waters in the Pleasantview watershed congregate in the holding pond within that time interval.

At trial neither Chabot nor the city established how much rain fell on June 25 and 26, 1983, because there were no rain collectors in the immediate area. The U.S. Weather Service reported heavy rain in Benton County on that day, and other witnesses testified that the rainfall was unusually heavy. Dr. Nelson testified that the heaviest it rained in any half-hour period at Sauk Rapids on June 25 and 26 was 1.4 inches. Based on the U.S. Weather Service calculations and the capacity of the holding pond, Dr. Nelson concluded that Sauk Rapids experienced a ten-year rain on June 25 and 26, 1983.

The jury found Sauk Rapids negligent and that the negligence was a direct cause of $53,000 in damages to Chabot's house.

## ISSUES

1. Did Sauk Rapids have a duty to use reasonable care in the operation and maintenance of its storm sewer system?

2. Is Sauk Rapids exempt from tort liability because of discretionary immunity and, if so, did it waive the immunity by purchasing liability insurance?

3. Was the jury verdict manifestly and palpably contrary to the evidence?

4. Did the jury improperly base the measure of damages on the diminution in value of the house, rather than on the cost of restoration?

5. Did the trial court err in not calculating pre-verdict interest from the date the action was commenced?

## ANALYSIS

### I

■ Minnesota cities have a legal duty to exercise reasonable care to keep facilities operated by them in safe condition. In *Johnson v. County of Nicollet*, 387 N.W.2d 209 (Minn.Ct.App.1986), we stated:

[T]he legal duties owed by municipalities as owners and operators of buildings, roadways, or other facilities * * * are analogous to those owed by private persons, and a breach of such duties can be the basis of a lawsuit against the municipality just as it can be the basis of a lawsuit against private tortfeasors.

*Id.* at 211 (quoting *Cracraft v. City of St. Louis Park*, 279 N.W.2d 801, 803 (Minn. 1979)); *Jackson v. City of St. Louis Park*, 261 Minn. 93, 97, 110 N.W.2d 510, 513 (1961) (city must exercise reasonable care to keep streets and sidewalks in safe condition); *Ondarko v. Village of Hibbing*, 256 Minn. 17, 96 N.W.2d 865, 867 (1959) (city which assumes control over a gas service line has duty of care for its maintenance).

■ Cases have specifically held that a city is liable for failure to provide proper accommodation for surface water in its storm sewer system. Notice of the dangerous condition and any municipal action which increases the risk of harm are significant in determining liability. *See Pettinger v. Village of Winnebago*, 239 Minn. 156, 163, 58 N.W.2d 325, 329 (1953) (city is liable when there is notice that sewer system is inadequate, defective and negligently maintained); *Greenwood v. Evergreen Mines Co.*, 220 Minn. 296, 303, 19 N.W.2d 726, 730–31 (1945) (city liable when it causes surface water in a natural channel to overflow onto adjoining property); *Stoehr v. City of St. Paul*, 54 Minn. 549, 56 N.W. 250, 251 (1893) (city liable for storm sewer

reservoir which is hazardous to persons below when city has constructive notice of potential problem with system); *Pye v. City of Mankato,* 36 Minn. 373, 375, 31 N.W. 863, 864 (1887) (city liable for inadequate storm gutter capacity if damaged property is put in worse condition than if there had been no gutters at all); *see also National Weeklies, Inc. v. Jensen,* 183 Minn. 150, 235 N.W. 905 (1931); *Robbins v. Village of Willmar,* 71 Minn. 403, 73 N.W. 1097 (1898); *O'Brien v. City of St. Paul,* 18 Minn. 176 (1872).

■ The dissent takes the position that the city did not "install" the pond and that the Chabot house was built in an area which was a natural water depository. The facts do not support this position. The city constructed the road embankment which served as a dam creating the holding pond. The pond was not in any sense part of a "natural" water depository, but was artificially created by the city. Sauk Rapids approved permits for development upstream from the holding pond after Chabot's house was built. This increased the runoff and discharge into the storm sewer system. The city also installed culverts which directed more water into the ditch leading to the holding pond. Intercepting the natural flow of water from the watershed and gathering it in the holding pond increased the risk of harm to Chabot's house.

■ Sauk Rapids clearly had notice that the holding pond was inadequate and potentially hazardous. Planning commission member Earl Bukowski, city council member Richard Gronau, and city engineer Mark Johnson all informed the city council that the holding pond was inadequate. The Barr Engineering report recommended immediate upgrading of the holding pond. The dissent implies that actual notice of a catastrophic event is required before the city is liable. The city had actual notice of the defective condition, and a ten-year rain is a reasonably foreseeable event. If the city has actual or constructive knowledge of the defective condition, notice of the occurrence of the specific event is not required. *See Stoehr,* 54 Minn. 549, 56 N.W.

250 (1893); *Pettinger,* 239 Minn. at 163, 58 N.W.2d at 329. The trial court did not err in instructing the jury that Sauk Rapids had a duty to use reasonable care in the operation and maintenance of its storm sewer system.

**II**

Sauk Rapids argues that it is immune from liability for damage caused by the storm sewer holding pond because decisions on improvements involve planning and policy for which the city cannot be held liable under the doctrine of discretionary immunity.

The general rule in Minnesota is that a "municipality is subject to liability for its torts and those of its officers, employees and agents acting within the scope of their employment or duties whether arising out of a governmental or proprietary function." Minn.Stat. § 466.02 (1982).

An exception to that general rule exempts the city from liability for claims "based upon the performance or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused." Minn.Stat. § 466.03, subd. 6 (1982). The rationale for the discretionary immunity exception is that a court, in a negligence action, is not an appropriate forum to review governmental policy or legislative decisions. *Cairl v. State,* 323 N.W.2d 20, 23 (Minn.1982).

However, as an exception to the general rule of governmental liability, the discretionary immunity exception is narrowly construed. *Larson v. Independent School District No. 314, Braham,* 289 N.W.2d 112, 121 (Minn.1979). The difficulty in applying the exception is that every act on the part of a city involves some exercise of discretion, but not every act is entitled to discretionary immunity. *Cairl,* 323 N.W.2d at 23.

Courts have attempted to distinguish a discretionary duty from a legal duty by applying a discretionary/ministerial or a planning/operational analysis. Minnesota uses the planning/operational distinction.

*See Cairl,* 323 N.W.2d at 23 n. 2. This distinction

> is not dependent upon whether a person's duty requires some degree of judgment and discretion. The crucial focus is upon the nature of the act undertaken. Decisions intended to be protected by discretionary immunity are those made upon the planning level of conduct.

*Larson,* 289 N.W.2d at 120. "Decisions to implement policy decisions are made at the operational level, however, and can be readily reviewed under judicially manageable tort standards of due care and reasonableness." *Johnson v. County of Nicollet,* 387 N.W.2d 209, 212 (Minn.Ct.App.1986) (citing *Butler v. State,* 336 N.W.2d 416, 420 (Ia.1983)); *see also Marlow v. City of Columbia Heights,* 284 N.W.2d 389, 392 (Minn.1979).

■■■ In this case the planning and installation of Sauk Rapids' storm sewer system would constitute planning level decisions, which would fall within discretionary immunity. However, the decision not to remedy the problem of the holding pond after the city had notice that it was inadequate was an operational level decision. A decision made at the operational level falls outside the discretionary immunity exception. *Cf. Johnson v. County of Nicollet,* 387 N.W.2d at 212 (decision on placement of a guardrail on a highway is an operational act implementing policy decision to permit public use of road); *Marlow v. City of Columbia Heights,* 284 N.W.2d at 392 (negligent operation of a city facility was at the operational level following a "planning" decision by the city to maintain a public landing).

Sauk Rapids' notice of the inadequacy of the holding pond also affects its claim of discretionary immunity. In *Ostendorf v. Kenyon,* 347 N.W.2d 834, 838 (Minn.Ct. App.1984), this court held that the placement of warning signs on a highway was not a discretionary act after the state had knowledge of a dangerous condition. Similarly, the court in *Hansen v. City of St. Paul,* 298 Minn. 205, 212, 214 N.W.2d 346, 350–51 (1974), held that it was not a discretionary act for the city not to control vicious dogs after the city had knowledge of the dangerous condition.

■■■ Chabot further contends that, irrespective of any claimed immunity, if a city obtains liability insurance, it waives the immunity defense to the extent of the coverage. The relevant statutory section reads:

> The governing body of any municipality may procure insurance against liability of the municipality * * * for damages resulting from its torts * * * including torts specified in section 466.03 for which the municipality is immune from liability * * *. The procurement of such insurance constitutes a waiver of the defense of governmental immunity to the extent of the liability stated in the policy but has no effect on the liability of the municipality beyond the coverage so provided.

Minn.Stat. § 466.06 (1982); *see also Andrade v. Elefson,* 391 N.W.2d 836, 840–41 (Minn.1986) (county, as employee of state, had immunity, but waived immunity to extent of its liability insurance).

In *Schoening v. United States Aviation Underwriters, Inc.,* 265 Minn. 119, 128–29, 120 N.W.2d 859, 865 (1963), the court explained the effect of obtaining insurance:

> [W]here a municipality expends public funds for the purchase of liability insurance, such expenditure constitutes a waiver by the municipality and its insurer to the extent of the policy coverage. Were we to hold otherwise, the funds so expended would be mere gifts to the insurance carriers. In accepting premium payments the insurer thereby accepts the risk growing out of the municipality's ownership and operation of municipal facilities. The real effect of this rule is not to deprive the municipality of any right inherent in, and essential to, its governmental functions, but is only to make an insurance carrier liable for the losses which it contracted to cover in its policy.

By obtaining insurance, Sauk Rapids waived immunity to the extent of its coverage.

## III

 Sauk Rapids argues that the jury's verdict is contrary to the evidence and should be set aside because it is not based on expert testimony showing what Sauk Rapids should have done to make its storm sewer system adequate. However, a trier of fact may find that a water treatment facility was negligently designed without aid of expert testimony. *City of Eveleth v. Ruble*, 302 Minn. 249, 255–56, 225 N.W.2d 521, 528 (1974). The test of whether expert testimony is necessary is whether the matter to be dealt with is so esoteric that jurors of common knowledge and experience cannot form a valid judgment on whether the parties' conduct was reasonable. *Roettger v. United Hospitals of St. Paul, Inc.*, 380 N.W.2d 856, 860 (Minn.Ct.App.1986). Chabot was not required to show how Sauk Rapids could have designed its storm sewer system to avoid liability.

Moreover, it is not accurate to say the jury made its decision without reference to expert opinion. There was expert testimony on the actual capacity of the holding pond and the amount of rainfall. Barr Engineering and Dr. Charles Nelson each calculated the holding pond's capacity as being too small. Dr. Nelson also testified on the amount of rainfall on June 25 and 26, 1983, which caused the pond to overflow.

Viewing the evidence in the light most favorable to the verdict and giving the verdict the benefit of every reasonable inference, there is sufficient evidence to support the jury verdict.

## IV

 When property is not totally destroyed, the measure of damages is ordinarily the difference in value before and after the loss, or the cost of restoration, whichever is less. *In re Commodore Hotel Fire & Explosion Cases*, 324 N.W.2d 245, 248 (Minn.1982); *Rinkel v. Lee's Plumbing & Heating Co.*, 257 Minn. 14, 20, 99 N.W.2d 779, 783 (1959).

 In this case a qualified contractor testified that it would cost $34,000 to restore the home to its pre-flood condition. An appraiser also testified that, prior to the flood damage, the Chabot home had a fair market value of $65,000, but after the flood damage, the house and real estate had a salvage value of $12,000. Therefore, the house had a diminished value of $53,000. In estimating the repair costs, the appraiser stated that even if Chabot spent $34,000 to repair the house, it would still sell for only $40,000 because of the knowledge that it had been damaged. Thus, complete cost of restoring the Chabot house to its pre-flood value would total $59,000—$34,000 for the repairs and $25,000 attributed to diminished value.

On that evidence, the jury found damages of $53,000, which the trial court adopted in its order for judgment. Sauk Rapids argues that the trial court erred in instructing the jury that it could base its damages on diminution in value, when the evidence indicated that the property could be repaired for a lesser amount. However, the evidence also indicated that repair would not have restored the house to its former market value. In those circumstances, the proper measure of damages is the lesser of (1) the cost of repair plus the remaining diminution in value; or (2) the total diminution in value. *Cf. Rinkel*, 257 Minn. at 20, 99 N.W.2d at 783. Because the complete cost of restoring the building to its former value exceeded the total diminution in value, the damages awarded were not excessive.

## V

Chabot argues that the trial court erred in not awarding pre-verdict interest from the date this action was commenced. Minn.Stat. § 549.09 provides:

[P]re-verdict or pre-report interest on pecuniary damages shall be computed as provided in clause (c) from the time of the commencement of the action, or the time of a written settlement demand, *whichever occurs first* * * *.

Minn.Stat. § 549.09, subd. 1(b) (1986) (emphasis added).

This action was commenced on July 3, 1984. Chabot made a written offer of settlement on December 9, 1985, for $15,000. No counter-offer was made, and the offer was withdrawn in January 1986. Following the jury verdict, Chabot sought to tax costs, disbursements and pre-verdict interest from the date of commencement of the action. The trial court erred in awarding pre-verdict interest from December 9, 1985, on the assumption that Chabot was entitled to interest only from the time the offer was made. The offer does not control the computation of interest because it occurred *after* commencement of the action.

## DECISION

The trial court is affirmed on the issues relating to the city's liability and damages and reversed on its calculation of pre-verdict interest. The case is remanded for recalculation of interest.

Affirmed in part and reversed in part.

SEDGWICK, Judge (dissenting).

I respectfully dissent from all issues decided by the majority except those of damages and pre-verdict interest.

The majority states that in order to recover against the City, Chabot need only show "the system was inadequate, that Sauk Rapids had notice of the inadequacy, and that it failed to correct the inadequacy that caused the damage." With these words the court endorses for the first time in Minnesota law a rule that a municipality is an insurer of the needs of one individual at the expense of the needs of all other citizens of the City. The authorized discretion of the governing council of Sauk Rapids to determine and implement needed capital improvements has been usurped by the court.

The record reflects that spending monies for storm sewer improvements was met with considerable public resistance at previous public hearings. A former City engineer testified that he and the City Council would have been lynched if it had approved an expenditure for a major improvement to the drainage system. This attitude observed by public officials only underscores the nature and importance of the decisions involved in approving capital improvements. Such decisions involve the highest degree of planning in City government. They are legislative or quasi-judicial in nature and those making them have always been immune from liability under Article III, Section 1 of the Minnesota Constitution, which divides the power of government into three distinct branches and prohibits a person belonging to one branch from exercising the power of another branch.

The Minnesota Supreme Court stated in *Cairl v. State,* 323 N.W.2d 20 (Minn.1982), that the discretionary act "exemption from tort liability recognizes that the courts, through the vehicle of a negligence action, are not an appropriate forum to review and second guess the acts of government which involve the exercise of discretion." *Id.* at 23.

Second guessing, however, is exactly what the majority opinion permits the trial court and jury to do. The facts here are simple. Sauk Rapids had several problem areas with respect to storm water ponding and runoff, as well as a need for future planning. A 1981 report by the BARR Engineering firm set forth design criteria for improving eight areas of the City. A ninth area which had had the most problems since 1950 was not included in the report. There is no indication that the City was ever in a financial position to implement the report in its entirety. Sauk Rapids planned to use the report for future incremental implementation. But the decisions of whether storm sewers had priority over other City needs; which of at least nine areas should have priority; how funding was to be obtained; the timing of the improvements; as well as public hearings inherent in the decisionmaking-funding-assessment process, had not been accomplished by the "ten year rain" which fell June 25–26, 1983.

The majority seeks to differentiate between the decision to plan and install a storm sewer, which it acknowledges as discretionary, and the decision not to remedy

the problem of the holding pond after the City had notice it was inadequate, which the majority views as an operational decision. Page 2 of the BARR report states:

The design criteria for this drainage plan were carefully selected because of the cost of providing complete drainage facilities represents a substantial expenditure *and the replacement of inadequate facilities represents an even greater cost.*

(Emphasis added.)

All of the considerations set forth above for making decisions on capital improvements apply to making decisions to remedy antiquated systems. The decisions cannot be differentiated. They are not operational, they are discretionary.

Even if they could, however, and even if inadequacy is the equivalent of negligence, there is still no duty owed Chabot. The City did not plan or install the pond. The pond resulted from a road built at some unknown time in the past, which dammed water into a natural basin. It had operated over 60 years without incident. Unlike all cases cited by the majority, the only notice the City had was that on some occasions over a 10 year period the pond rose to the level of the road which separated it from Chabot's house. Here, the City had notice of the inadequacies of several storm water areas in Sauk Rapids, potentially affecting many citizens, while Chabot's house was the only one affected by the pond.

In the case which partially abolished sovereign immunity, *Spanel v. Mounds View School District,* 264 Minn. 279, 118 N.W.2d 795 (1962), the Supreme Court recognized the unique nature of legislative decisions.

However, we do not suggest that discretionary as distinguished from ministerial activities, or judicial, quasi-judicial, legislative or quasi-legislative functions may not continue to have the benefit of the rule.

264 Minn. at 292–93, 118 N.W.2d at 803 (footnotes omitted).

We can say of the facts here what the Supreme Court said in *Cairl v. State,* 323 N.W.2d 20 (Minn.1982).

In short, regardless of the precise scope of discretionary immunity, defendants in this case did not approach the point at which discretion is exhausted and a duty arises.

*Id.* at 24.

Minn.Stat. §§ 466.02—.15 does not create a tort where none existed before, but simply removes the defense of sovereign immunity where a municipality would have been liable in tort but for the sovereign immunity doctrine.

The purchase of liability insurance by the City only waives the defense of immunity. It does not create liability in tort where none existed by statute or at common law.

Minn.Stat. § 466.06 (1983) states:

The governing body of any municipality may procure insurance against liability of the municipality * * * *for damages resulting from its torts * * * including torts specified in section § 466.03 for which the municipality is immune from liability* * * *. The procurement of such insurance constitutes a waiver of governmental immunity to the extent of the liability stated in the policy but has no effect on the liability of the municipality beyond coverage so provided.

(Emphasis added.)

The statute does not create tort liability. *Andrade v. Ellefson,* 391 N.W.2d 836 (Minn.1986), found a *tort duty of care* on behalf of a county to children in day care and their parents. Even though the County had statutory governmental immunity for its role in state licensure of day care facilities, the immunity was waived to the extent of the county's liability insurance *because the county owed a tort duty of care. Id.* at 837.

If there were some special duty of care owed Chabot, different from the duty owed the general public, for which *tort liability* could be imposed on the City, then the City would lose its immunity to the extent of the liability insurance. Here, there is no special duty under the four factors of *Cracraft v. City of St. Louis Park,* 279 N.W.2d 801 (Minn.1979):

1) actual knowledge by the city of the dangerous condition

2) reasonable reliance on specific representations of the municipality

3) a statutory duty for municipal protection of a particular class

4) municipal action which increases the risk of harm.

*Andrade*, 391 N.W.2d at 841. As *Andrade* points out, actual knowledge of a dangerous condition tends to impose a special duty to do something about that condition. Actual, not constructive, knowledge is required. *Andrade* (citing *Hage v. Stade*, 304 N.W.2d 283 at 288 n. 2 (Minn.1981). As in *Andrade*, here the City had knowledge of "warning flags," i.e., warnings dating back to the 1970's that the pond was inadequate, but it had not overflowed in 60 years. Factors two and three are inapplicable. Factor four could only be applied to granting building permits which facilitated development and therefore additional runoff. I think this factor is weak at best because municipalities cannot arbitrarily deny permits to use land.

Chabot's house was built across the street from the holding pond in an area which was a natural surface water depository from the hills above to the river below his land. In an attempt to avoid the natural consequences of runoff, the house had 8 inch drainage pipes running through the yard, a concrete spillway across the property approximately 40 feet long and 3 feet wide, and tiles or grooves and a sump pump in the basement. The rainfall on June 25, 1983 was, from the testimony of many witnesses, unique. It was necessary to pump basements all over town, indicating that the drainage capacity of the City's several holding ponds was widely exceeded.

No special duty has been shown to exist from Sauk Rapids to Chabot. No negligence has been shown by the fact that the pond was inadequate or in maintaining this natural watershed. In addition, there is absolutely no proof that Chabot's house would not have been damaged by the flooding of June 25–26, even if the BARR report had been implemented.

The judgment should be reversed.